# 22-2649

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

———————————————

CHINESE AMERICAN CITIZENS ALLIANCE OF GREATER NEW YORK,
Plaintiff - Appellant,

CHRISTA MCAULIFFE INTERMEDIATE SCHOOL PTO, INC.,
ASIAN AMERICAN COALITION FOR EDUCATION,
PHILLIP YAN HING WONG, YI FANG CHEN, CHI WANG,
Plaintiffs,

v.

ERIC ADAMS, in his official capacity as Mayor of New York,
RICHARD A CARRANZA, in his official capacity as Chancellor of the New York
City Department of Education,
Defendants - Appellees,

TEENS TAKE CHARGE, DESIS RISING UP AND MOVING, HISPANIC
FEDERATION, ELIZABETH PIERRET, on behalf of her minor son
O.R., ODUNLAMI SHOWA, on behalf of his minor child
A.S., TIFFANY BOND, on behalf of her minor child K.B, LAUREN MAHONEY,
on behalf of her minor children N.D.F and N.E.F, ROSA VELASQUEZ, on behalf
of her minor child C.M., COALITION FOR ASIAN AMERICAN CHILDREN
AND FAMILIES,
Intervenors - Appellees.

———————————————

On Appeal from the United States District Court
for the Southern District of New York
Honorable Edgardo Ramos, District Judge

———————————————

**BRIEF OF INTERVENORS-APPELLEES IN SUPPORT OF AFFIRMANCE**

———————————————

Janai S. Nelson
*Director-Counsel*
Samuel Spital
Rachel Kleinman
Kevin Jason
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
40 Rector St., 5th Floor
New York, NY 10006
Tel: (212) 965-2200

Jin Hee Lee
Michaele N. Turnage Young
Molly M. Cain
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
700 14th Street NW, Suite 600
Washington, DC 20005
Tel: (202) 682-1300

Sarah Hinger
AMERICAN CIVIL LIBERTIES UNION
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 519-7882

Stefanie D. Coyle
Arthur Eisenberg
Emma Hulse*
NEW YORK CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street,
19th Floor
New York, NY 10004
Tel: (212) 607-3300
*Admission Pending

Francisca D. Fajana
LATINOJUSTICE PRLDEF
475 Riverside Drive, Suite 1901
New York, NY 10115
Tel: (212) 219-3360

Elizabeth A. Ritvo
BROWN RUDNICK LLP
One Financial Center
Boston, MA 02111
Tel: (617) 856-8249

John G. Doyle
BROWN RUDNICK LLP
601 Thirteenth Street NW
Washington, D.C. 20005
Tel: (202) 536-1700

Caitlin Felise C. Ramiro
Samuel J. Hickey
BROWN RUDNICK LLP
7 Times Square
New York, NY 10036
Tel: (212) 209-4800

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1, the undersigned counsel for Intervenors-Appellees make the following disclosures:

Teens Take Charge is a non-profit organization, fiscally sponsored by FJC, a 501(c)(3) public charity. It does not issue stock, and thus, no publicly held corporation can own 10 or more percent of its stock.

Desis Rising Up and Moving is a membership-led not-for-profit organization with no parent, subsidiary, or corporate affiliate. It does not issue stock, and thus, no publicly held corporation can own 10 or more percent of its stock.

Hispanic Federation is a not-for-profit member organization, incorporated under the laws of the state of New York, with no parent, subsidiary, or corporate affiliate. It does not issue stock, and thus, no publicly held corporation can own 10 or more percent of its stock.

Coalition for Asian American Children and Families is a not-for-profit organization with no parent, subsidiary, or corporate affiliate. It does not issue stock, and thus, no publicly held corporation can own 10 or more percent of its stock.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ..........................................................i

TABLE OF CONTENTS.......................................................................... ii

TABLE OF AUTHORITIES ....................................................................iv

STATEMENT OF JURISDICTION........................................................1

STATEMENT OF THE ISSUES............................................................1

STATEMENT OF THE CASE.................................................................2

I.      The Specialized High Schools Admissions Process Has Long Under-
        Identified Talented Black and Latinx Students. .................................6

II.     The Specialized High Schools' Admissions Process Prompts Public
        Scrutiny and Government Change.........................................................9

III.    Procedural History .....................................................................14

SUMMARY OF THE ARGUMENT ....................................................16

STANDARD OF REVIEW .................................................................21

ARGUMENT .........................................................................................21

I.      The Discovery Expansion Does Not Have a Discriminatory Effect on
        Asian Americans and Does Not Violate the Equal Protection Clause. .........22

        A.      CACAGNY Must Show That the Challenged Policy Has an
                Adverse Racially Discriminatory Effect to Sustain an Equal
                Protection Claim in This Circuit. ........................................22

        B.      The Correct Way to Measure Discriminatory Effect is to
                Compare the Relevant Applicant Pool to the Share of Students
                Admitted to the Selective Program. ....................................25

        C.      CACAGNY Has Not Shown Discriminatory Effect............................27

        D.      Discriminatory Effect Cannot Be Shown Through Isolated
                Examples at Two of the Eight Specialized High Schools..................30

E.    This Court Should Reject CACAGNY's Argument That the Discovery Expansion Treats Asian Americans Unequally and Thus Should Be Subjected to the Standard Applied to Facially Discriminatory Policies Rather Than Race-Neutral Policies. .............35

CONCLUSION ........................................................................................39

CERTIFICATE OF COMPLIANCE ......................................................42

CERTIFICATE OF SERVICE ...............................................................43

# TABLE OF AUTHORITIES

**Page(s)**

C<small>ASES</small>:

*Anderson ex rel. Dowd v. City of Boston*,
  375 F.3d 71 (1st Cir. 2004) ........................................................ 19, 31, 32, 33, 38

*Ass'n for Educ. Fairness v. Montgomery Cnty. Bd. of Educ.*,
  560 F. Supp. 3d 929 (D. Md. 2021) .............................................. 20, 38

*Ass'n for Educ. Fairness v. Montgomery Cnty. Bd. of Educ.*,
  No. 8:20-CV-02540-PX, 2022 WL 3019762 (D. Md. July 29, 2022),
  *motion for relief from judgment denied*, No. 8:20-CV-02540-PX,
  2022 WL 17740402 (D. Md. Dec. 16, 2022) .............................. 24, 25, 26, 28, 29

*Atkins v. Westchester Cnty. Dep't of Soc. Serv.*,
  31 F. App'x 52 (2d Cir. 2002) ..................................................... 23-24

*Bey v. City of New York*,
  999 F.3d 157 (2d Cir. 2021) ........................................................ 21

*Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of City of
  Bos.*, 996 F.3d 37 (1st Cir. 2021) ................................................ 24, 32

*Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of City of
  Bos.*, 2021 WL 1422827 (D. Mass. Apr. 15, 2021), *opinion
  withdrawn for other reasons* ...................................................... 33, 37

*Bos. Parent Coalition for Acad. Excellence Corp. v. Sch. Comm. of
  City of Bos.*, No. 21-10330-WGY, 2021 WL 3012618 (D. Mass.
  July 9, 2021) ............................................................................... 33

*Bos. Parent Coalition for Acad. Excellence Corp. v. Sch. Comm. of
  Boston*, 2021 WL 4489840 (D. Mass. Oct. 1 2021) ........................... 33

*Brown v. City of Oneonta*,
  221 F.3d 329 (2d Cir. 2000) ........................................................ 23

*Chabad Lubavitch of Litchfield Cnty., Inc. v. Litchfield Historic Distr. Com'n*, 768 F.3d 183 (2d Cir. 2014) ............................................................. 18, 21

*Chavez v. Illinois State Police*,
251 F.3d 612 (7th Cir. 2001) .................................................................. 24

*Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio*,
364 F. Supp. 3d 253 (S.D.N.Y. 2019) ....................................... 5, 10, 14

*Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio*,
No. 18-CV-11657-ER, 2020 WL 1432213 (S.D.N.Y. Mar. 24, 2020) .......... 14-15

*Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio*,
No. 18-CV-11657-ER, 2022 WL 4095906 (S.D.N.Y. Sept. 7, 2022) .......... *passim*

*City of Richmond v. J.A. Croson Co.*,
488 U.S. 469 (1989) ............................................................................... 5

*Coal. for TJ. v. Fairfax Cnty. Sch. Bd.*,
No. 22-1280, 2022 WL 986994 (4th Cir. Mar. 31, 2022) ...................... 25, 26, 33

*Doe ex rel. Doe v. Lower Merion Sch. Dist.*,
665 F.3d 524 (3d. Cir. 2011) ............................................................. 20, 38

*Griggs v. Duke Power Co.*,
401 U.S. 424 (1971) .............................................................................. 33

*Hayden v. County of Nassau*,
180 F.3d 42 (2d Cir. 1999) ............................................................. *passim*

*Jana-Rock Constr., Inc. v. N.Y. State Dep't of Econ. Dev.*,
438 F.3d 195 (2d Cir. 2006) .................................................................... 5

*N.C. State Conf. NAACP v. McCrory*,
831 F.3d 204 (4th Cir. 2016) ........................................................... 38, 39

*Pac. Shores Prop., LLC v. City of Newport Beach*,
730 F.3d 1142 (9th Cir. 2013) ............................................................. 36

*Pers. Adm. of Mass. v. Feeney*,
    442 U.S. 256 (1979) ...................................................................... 27, 37

*Regents of Univ. of California v. Bakke*,
    438 U.S. 265 (1978) ............................................................................ 35

*Sharif v. N.Y. State Educ.. Dep't*,
    709 F. Supp. 345 (S.D.N.Y. 1989)...................................................... 34

*Sista v. CDC Ixis N. Am., Inc.*,
    445 F.3d 161 (2d Cir. 2006).............................................................. 21

*United States v. City of Yonkers*,
    96 F.3d 600 (2d Cir. 1996)................................................................. 23

*Vaughns v. Bd. of Educ. of Prince George's Cnty.*,
    574 F. Supp. 1280 (D. Md. 1983), *aff'd in part, rev'd in part on
    other grounds*, 758 F.2d 983 (4th Cir. 1985) ...................................... 26

*Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*,
    429 U.S. 252 (1977) ..................................................................... 18, 23

*Washington v. Davis*,
    426 U.S. 229 (1976) ............................................................... 18 19, 31

## CONSTITUTIONAL PROVISIONS:

Fourteenth Amendment ................................................................. *passim*

## STATUTES:

28 U.S.C. § 1291 ..................................................................................... 1

28 U.S.C. § 1331 ..................................................................................... 1

42 U.S.C. § 4000(b) ................................................................................ 2

N.Y. Const., art. I, § 11 ........................................................................... 2

N.Y. Educ. Law § 2590-g(12)(b) (1997) ................................................. 6

N.Y. Educ. Law § 2590-g(12)(d) ............................................................ 10

N.Y. Exec. L. § 291, Editor's Notes (Consol. 2023) ................................. 2

RULES:

Federal Rules of Appellate Procedure 26.1 .............................................. i

Fed. R. Civ. P. 56(a) .............................................................................. 21

REGULATIONS:

34 C.F.R. § 100.3(b)(2) ........................................................................... 2

OTHER AUTHORITIES:

Jim Dwyer, *Decades Ago, New York Dug a Moat around Its Specialized Schools*, N.Y. TIMES (June 8, 2018) ..................................... 6

Roy O. Freedle, *Correcting the SAT's Ethnic and Social-Class Bias: A Method for Reestimating SAT Scores*, 73 HARV. EDUC. REV. 1 (2003) .................................................................................................. 7

*Gallup-McKinley Cnty. Sch. Resol.*, U.S. Dep't of Educ., No. 08-11-5002 (2017) ....................................................................................... 26

Rashea Hamilton et al., *Disentangling the Roles of Institutional and Individual Poverty in the Identification of Gifted Students*, 62 GIFTED CHILD Q. 6 (2018) .................................................................. 13

*Health of Asians and Pacific Islanders*, NYC.GOV (2021) .................................... 17

Damon T. Hewitt, NAACP Legal Def. & Educ. Fund, Inc., et al., to N.Y. Office, Office for Civil Rights, U.S. Dep't of Educ. (Sept. 27, 2012) ...................................................................................................... 4

James W. Loewen, *Consultation on the Validity of Testing in Education and Employment before the U.S. Commission on Civil Rights* (June 16, 1989), *in* THE VALIDITY OF TESTING IN EDUCATION AND EMPLOYMENT (Eileen Rudert ed., 1993). ....................................... 3

Scott J. Peters & Kenneth G. Engerrand, *Equity and Excellence: Proactive Efforts in Identification of Underrepresented Students for Gifted and Talented Services*, 60(3) GIFTED CHILD Q. 159 (2016) ............... 12-13

Jay Rosner, *The SAT: Quantifying the Unfairness Behind the Bubbles*, *in* SAT WARS: THE CASE FOR TEST-OPTIONAL COLLEGE ADMISSIONS (Joseph A. Soares 2015) ........................................................................ 7

Maria Veronica Santelices & Mark Wilson, *Unfair Treatment? The Case of Freedle, the SAT, and the Standardization Approach to Differential Item Functioning*, 80 HARV. EDUC. REV. 106 (2010) ....................... 7

Taylor, Jonathan, *Policy Implications of a Predictive Validity Study of the Specialized High School Admissions Test at Three Elite New York City High Schools* (2015) (Ph.D dissertation, Graduate Center, City University of New York) (ProQuest) ............................................. 8

Taylor, Jonathan, *Fairness to Gifted Girls: Admissions to New York City's Elite Public High Schools*, 25 J. WOMEN & MINORITIES SCI. & ENG'G 1 (2019) ..................................................................................... 8

Jaclyn Zubrzycki, *Civil Rights Group Questions Specialized Schools' Admissions in N.Y.C.*, EDUC. WEEK (Sept. 27, 2012) ........................................... 3

## STATEMENT OF JURISDICTION

The District Court had jurisdiction over Chinese American Citizens Alliance of Greater New York's ("CACAGNY") Equal Protection claim under 28 U.S.C. § 1331. On September 8, 2022, the District Court granted summary judgment for the Defendants. CACAGNY timely appealed. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

A.      Whether summary judgment was appropriate on Chinese American Citizens Alliance of Greater New York's ("CACAGNY") Equal Protection claim because CACAGNY failed to sustain its required burden of proving that the Discovery Expansion had a discriminatory effect on Asian Americans, where (i) CACAGNY concedes that "Asian American admissions to the specialized schools as a whole fared slightly better under the policy," (ii) in 2019 and 2020, Asian Americans were up to 6 to 7.5 times more likely than Black, Latinx, and white students to receive an offer, and (iii) after the Discovery Expansion, Asian Americans were consistently given offers at a rate considerably higher than their participation in the applicant pool.

B.      Whether the Discovery Expansion on its face discriminates against Asian American students, even though it is a race-neutral reform that applies to every student seeking admission to New York City's Specialized High Schools.

## STATEMENT OF THE CASE

Pursuant to federal and state law,[1] New York City and its Department of Education (together, "NYCDOE") have a responsibility to ensure that all students have an equal opportunity to compete for admission to its public, taxpayer-funded Specialized High Schools.[2] Yet, for decades, NYCDOE has maintained an admissions process that results in the marked under-identification of Black and Latinx students eligible for admission to the City's most prestigious schools. *See* Joint Appendix ("J.A.") 497–498. Although two-thirds of New York City public

---

[1] *See, e.g.*, 42 U.S.C. § 4000(b); 34 C.F.R. § 100.3(b)(2) (prohibiting racial discrimination, including policies that have the effect of denying the benefit of a federally funded program to individuals of a certain race); N.Y. Const., art. I, § 11 ("No person shall be denied the equal protection of the laws of this state or any subdivision thereof. No person shall, because of race, color, creed or religion, be subjected to any discrimination in his or her civil rights by any other person or by any firm, corporation, or institution, or by the state or any agency or subdivision of the state."); N.Y. Exec. L. § 291, Editor's Notes (Consol. 2023) (outlawing policies that have a racially disparate impact, imposing "a responsibility to act to assure that every individual within this state is afforded an equal opportunity to enjoy a full and productive life," and guaranteeing that the "opportunity to obtain education . . . without discrimination because of . . . race, . . . color, [or] national origin" is a "civil right.").

[2] NYCDOE operates eight Specialized High Schools: Bronx High School of Science ("Bronx Science"); Stuyvesant High School ("Stuyvesant"); Brooklyn Technical High School ("Brooklyn Tech"); Brooklyn Latin School ("Brooklyn Latin"); High School for Mathematics, Science and Engineering at City College of New York ("HSMSE"); High School of American Studies at Lehman College ("Lehman"); Staten Island Technical High School ("Staten Island Tech"); and Queens High School for the Sciences at York College ("Queens Science"). J.A. 498.

school students are Black and Latinx, they represent only a small fraction of students enrolled in the Specialized High Schools. *Id.*

No racial group has a monopoly on talent, and the systematic exclusion of Black and Latinx students does not reflect a lack of aptitude to excel in the Specialized High Schools. *See id.* Instead, as advocates have demonstrated, using the Specialized High School Admissions Test ("SHSAT") as the sole determinant of admission to these public schools is an invalid method of admission and a poor predictor of performance that leads to the glaring lack of Black and Latinx students at the Specialized High Schools.[3] *See* Jaclyn Zubrzycki, *Civil Rights Group Questions Specialized Schools' Admissions in N.Y.C.*, EDUC. WEEK (Sept. 27, 2012). The single-test admissions process is flawed because it fails to achieve its stated purpose: to objectively and fairly identify all students who could thrive in the Specialized High Schools. *See* J.A. 498. "Under this admissions policy, regardless of whether a student has achieved straight A's from kindergarten through eighth grade or whether he or she demonstrates other signs of high academic potential, the only factor that matters for admission is his or her score on a single test." *See* Letter

---

[3] Tests are "valid" when they assess "what they claim to test (i.e., content validity) and correlate strongly with performance in [the academic institution they are used to assess suitability for] (predictive validity)." *Consultation on the Validity of Testing in Education and Employment Before the U.S. Commission on Civil Rights* (June 16, 1989) (statement of James W. Loewen), *in* THE VALIDITY OF TESTING IN EDUCATION AND EMPLOYMENT, 42 (Eileen Rudert ed., 1993).

from Damon T. Hewitt, NAACP Legal Def. & Educ. Fund, Inc., et al., to N.Y. Office, Office for Civil Rights, U.S. Dep't of Educ. (Sept. 27, 2012), available at https://www.naacpldf.org/wp-content/uploads/Specialized-High-Schools-Complaint.pdf.

Faced with a flawed admissions process that relies on a single multiple-choice test and the resulting longstanding, marked under-identification of Black and Latinx students for elite high schools in a majority Black and Latinx school district, NYCDOE took modest action designed to improve access. *See* J.A. 499. It did so by making limited revisions to the Discovery Program, which is the supplemental admissions program for the Specialized High Schools that allows some disadvantaged students (of all races) who score under the cutoff on the SHSAT to nonetheless receive an offer of admissions. *See* J.A. 500. First, NYCDOE revised the Discovery Program's definition of "disadvantaged" to focus on attendance at high-poverty schools, and second, NYCDOE increased the allocation of available seats to Discovery Program students to 20% (collectively "Discovery Expansion"). *See* J.A. 500–01.

In seeking to reinstate the previous version of the Discovery Program, Appellant Chinese American Citizens Alliance of Greater New York ("CACAGNY") would have NYCDOE abdicate its responsibility to make the admissions process fair for all students. CACAGNY baselessly characterizes

NYCDOE's race-neutral effort to provide students of all races with equal educational opportunities as intentional racial discrimination against Asian Americans.

Binding precedent forecloses CACAGNY's theory. The Equal Protection Clause does not prohibit a school district from making policy changes to a flawed admissions process simply because it is foreseeable, or intended, that those changes may help remedy the conspicuous under-identification of Black and Latinx students. As the lower court recognized, to adopt CACAGNY's conclusion "requires one to accept the proposition that a facially neutral policy seeking to improve racial diversity necessarily carries with it discriminatory intent. That is not the law." *Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio*, 364 F. Supp. 3d 253, 278 (S.D.N.Y. 2019) (hereinafter "*McAuliffe I*"). This Court has likewise made clear that "nothing in our jurisprudence precludes the use of race-neutral means to improve racial and gender representation." *Hayden v. County of Nassau*, 180 F.3d 42, 51 (2d Cir. 1999) (citing *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 509-10 (1989)). Indeed, "to equate a 'desire to eliminate the discriminatory impact' on some disadvantaged groups with 'an intent to discriminate against' other groups 'could seriously stifle attempts to remedy discrimination.'" *Jana-Rock Constr., Inc. v. N.Y. State Dep't of Econ. Dev.*, 438 F.3d 195, 211 (2d Cir. 2006) (quoting *Hayden*, 180 F.3d at 51).

Among other fundamental flaws with CACAGNY's theory, it cannot demonstrate *any* discriminatory effect from NYCDOE's new admissions policy. Asian American students remain significantly more likely to be given an offer of admission than their peers, and their representation in the Specialized High Schools has in fact slightly increased under the challenged Discovery Expansion. *See* J.A. 502.

Accordingly, Intervenors-Appellees Teens Take Charge, Desis Rising Up and Moving, Hispanic Federation, and the Coalition for Asian American Children and Families urge this Court to affirm the District Court's grant of summary judgment.

## I.    The Specialized High Schools Admissions Process Has Long Under-Identified Talented Black and Latinx Students.

Since 1971, the sole determinant of admission to the Specialized High Schools is a student's rank-order score on the SHSAT. *See* J.A. 157; N.Y. Educ. Law § 2590-g(12)(b) (1997). For at least as long, there have been serious concerns that the SHSAT, like other standardized tests, underpredicts the potential of Black and Latinx examinees.[4] Such tests often pose questions using language with varying

---

[4] Jim Dwyer, *Decades Ago, New York Dug a Moat around Its Specialized Schools*, N.Y. Times (June 8, 2018), available at https://www.nytimes.com/2018/06/08/nyregion/about-shsat-specialized-high-schools-test.html (noting that, as the 1971 law requiring the SHSAT was being considered, there were "serious charges 'that the examinations discriminate on cultural grounds, against Negro and Puerto Rican applicants.'").

colloquial meanings, with the exam crediting answers that reflect the meaning most frequently used in white, middle-class homes like those of the test creators.[5] Such culturally biased questions artificially depress the test scores of Black and Latinx examinees.[6] Adding insult to injury, test makers' reliability checks reproduce that cultural bias over time, only deeming new test questions reliable enough to be added to the test if "high ability" examinees (those who understood the semantics used in white, middle-class homes) perform well on them.[7] Given the racial bias baked into the test itself and unequal access to test preparation courses, it is unsurprising that some studies have found that the predictive validity of the SHSAT is low.[8]

---

[5] *See generally* Roy O. Freedle, *Correcting the SAT's Ethnic and Social-Class Bias: A Method for Reestimating SAT Scores*, 73 HARV. EDUC. REV. 1, 28–29 (2003) (also noting that there is "evidence for this bias pattern across a wide span of tests" and mentioning evidence of cultural bias on Advanced Placement exams, the GRE, and high school vocabulary exams); Maria Veronica Santelices & Mark Wilson, *Unfair Treatment? The Case of Freedle, the SAT, and the Standardization Approach to Differential Item Functioning*, 80 HARV. EDUC. REV. 106, 126, 128 (2010) (replicating Freedle's findings, showing that one standardized test - the SAT - "favors one ethnic group over another" and calling into "question the validity of SAT verbal scores for [Black] examinees.")

[6] *See id.*

[7] Jay Rosner, *The SAT: Quantifying the Unfairness Behind the Bubbles*, *in* SAT WARS: THE CASE FOR TEST-OPTIONAL COLLEGE ADMISSIONS 134 (Joseph A. Soares 2015) (internal citation omitted) (This process is "used by psychometricians to construct admissions tests such as the SAT, ACT, GRE, LSAT, GMAT, MCAT, and many other bubble tests.").

[8] Gundanna Decl., *Christa McAuliffe Intermediate Sch. PTO, Inc. v. Adams*, No. 1:18-CV-11657-ER (June 27, 2019), ECF No. 102-9 at 12 ("As a single determinant for admissions to the specialized high schools, the current exam is not only shown

As Intervenors-Appellees highlighted below, the "current single-test method of admissions to the Specialized High Schools makes it unlikely for even highly capable students from Black, Latinx, and underrepresented Asian communities, who are more likely to attend high-poverty, low-opportunity, and segregated middle schools, to access these elite schools." Memo. of Law in Support of Mot. to Intervene as Defs., *Christa McAuliffe Intermediate Sch. PTO, Inc. v. Adams¸* No. 1:18-CV-11657-ER (S.D.N.Y. June 27, 2019), ECF No. 101, at 20.

The racial makeup of New York City's public high schools in 2019 was 40% Hispanic, 26% Black, 16% Asian American, and 15% white. J.A. 497. Even though Black and Hispanic students made up 66% of New York City public high school students, they only made up 13.5% of Brooklyn Tech students, 8.7% of Bronx Science students, 3.5% of Staten Island Tech students, 23.9% of Brooklyn Latin students, 25.2% of HSMSE students, 8.4% of Queens Science students, and 15% of students at Lehman. *Id.* In contrast, Asian Americans made up 61.3% of Brooklyn Tech students, 65.6% of Bronx Science students, 48.4% of Staten Island Tech

---

to be an invalid admissions measure, but it is also discriminatory and detrimental to the long-term success of all students, including APA students." *See also* Taylor, Jonathan, *Policy Implications of a Predictive Validity Study of the Specialized High School Admissions Test at Three Elite New York City High Schools* (2015) (Ph.D dissertation, Graduate Center, City University of New York) (ProQuest), https://www.proquest.com/openview/5d238f2ba4f286786a68f29be59b4159/1?pq-origsite=gscholar&cbl=18750; Taylor, Jonathan, *Fairness to Gifted Girls: Admissions to New York City's Elite Public High Schools*, 25 J. WOMEN & MINORITIES SCI. & ENG'G 1, 89 (2019).

students, 51.5% of Brooklyn Latin students, 36.2% of HSMSE students, 81% of Queens Science students, and 22% of the Lehman students. J.A. 498. White students were also overrepresented compared to their share of the student population, making up 23.3% of Brooklyn Tech students, 23.3% of Bronx Science students, 44.8% of Staten Island students, 13.9% of Brooklyn Latin students, 27.2% of HSME students, 5.9% of Queens Science students, and 58.5% of the Lehman students. *Christa McAuliffe*, No. 1:18-cv-11657 (S.D.N.Y. Dec. 13, 2018), ECF No. 18-4. In 2018, Stuyvesant admitted almost a thousand students, but only 10 of those students were Black and less than 30 were Latinx. J.A. 233.

## II. The Specialized High Schools' Admissions Process Prompts Public Scrutiny and Government Change.

The paucity of Black and Latinx students in the Specialized High Schools and the use of admissions criteria comprised of a single test score, have attracted, as the District Court highlighted, "scrutiny from civil rights groups and government agencies" for decades. *Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio*, No. 18-CV-11657-ER, 2022 WL 4095906, at *1 (S.D.N.Y. Sept. 7, 2022) ("*McAuliffe III*") (also noting that the racial disparity in admissions to the Specialized High Schools has been recognized as a persistent "problem").[9] In

---

[9] There have been two investigations done by the U.S. Department of Education's Office for Civil Rights ("OCR") into whether the use of the SHSAT as an admission standard constituted a form of discrimination against racial minorities and women,

response, in 2018, NYCDOE began considering measures to address the conspicuous under-identification of talented Black and Latinx students capable of success at the Specialized High Schools and increase their geographic and socioeconomic diversity. *See* J.A. 499.

The 1971 Hecht-Calandra Act ("Act"), which makes the SHSAT determinative in admissions, permits the use of a "[D]iscovery [P]rogram to give disadvantaged students of demonstrated high potential an opportunity" to earn admission into one of the Specialized High Schools. J.A. 157; N.Y. Educ. Law § 2590-g(12)(d). The Discovery Program is open to students who (1) take the SHSAT but score just below the score cut-off; (2) are certified by their local schools as "disadvantaged"; (3) are recommended by their middle school "as having high potential for the special high school program"; and (4) attend, and subsequently pass, a summer preparatory program administered by the high school. J.A. 157; N.Y. Educ. Law § 2590-g(12)(d).

On June 3, 2018, then-Mayor de Blasio and then-Chancellor Carranza announced a modest set of remedial measures, in part to address the under-identification of meritorious Black and Latinx students and to ensure that

---

first in 1977 and second in 2012, in response to a complaint filed by numerous community groups represented by NAACP Legal Defense and Educational Fund, Inc., Latino Justice PRLDEF, and the Center for Law and Social Justice at Medgar Evers College. *See McAuliffe I*, 364 F. Supp. 3d at 266.

disadvantaged students residing in New York City have an opportunity to enroll in, and benefit from, the Specialized High Schools. Wallack Decl. ¶ 19, *McAuliffe Intermediate Sch. PTO, Inc. v. Adams*, No. 1:18-CV-11657-ER (Jan. 17, 2019), ECF 50.[10] First, NYCDOE announced the mandatory use and expansion of the Discovery Program by all Specialized High Schools. J.A. 499. This change required that each Specialized High School use the Discovery Program to fill at least 13% of its seats for the 2019-2020 school year and 20% of its seats in the following years. J.A. 430–31.

Second, NYCDOE changed the methodology for determining whether a student applicant is "disadvantaged" in order to target disadvantaged students more accurately for eligibility in the Discovery Program. Wallack Decl. ¶¶ 4, 25, *McAuliffe Intermediate Sch. PTO, Inc. v. Adams*, No. 1:18-CV-11657-ER (Jan. 17, 2019), ECF No. 50. Prior to the Discovery Expansion, NYCDOE considered a student disadvantaged and eligible for the Discovery Program if one of the following five factors was satisfied: (1) eligibility for free lunch; (2) eligibility for reduced-price lunch and attendance at a Title I school; (3) receipt of New York City public assistance; (4) status as a foster child, ward of the state, or residency in temporary housing; or (5) residency in the United States for under four years in a home with a

---

[10] *See also id.* at ¶ 25 ("The gradual expansion of the Discovery Program is designed to increase the diversity of the Specialized High School[s] across these dimensions[:] racial, ethnic, geographic and socio-economic. . .").

primary language other than English. J.A. 500. Now, in addition to meeting substantially the same requirements, to be eligible for the Discovery Program, a student must also attend a high-poverty middle school according to the City's Economic Need Index ("ENI")—a school with an ENI of 0.6 or above. Wallack Decl. ¶ 20, *McAuliffe Intermediate Sch. PTO, Inc. v. Adams*, No. 1:18-CV-11657-ER (Jan. 17, 2019), ECF No. 50; J.A. 500. A middle school's ENI is a race-neutral measure of disadvantage that is determined by averaging the Economic Need Value ("ENV") of each student. *See* J.A. 500. ENV is a NYCDOE measure of a given student's economic hardship. *See id.* NYCDOE uses the ENI factor to make "a more specific assessment of the level of economic hardship at a school" and chose the 0.6 threshold "to more precisely target schools where the majority of students are facing economic hardship and the disadvantages that accompany it." Wallack Decl. ¶ 25, *McAuliffe Intermediate Sch. PTO, Inc. v. Adams*, No. 1:18-CV-11657-ER (Jan. 17, 2019), ECF No. 50.[11]

---

[11] As the District Court recognized, "scientific studies show that low-income students attending high-poverty schools are more disadvantaged . . . than similarly-situated students attending lower-poverty schools." *McAuliffe III*, 2022 WL 4095906, at *8. Low-income students who attend high-poverty schools have far less opportunity to develop latent talent than low-income students who attend schools with a lower concentration of poverty, and, consequently, are less likely to be identified as meriting admission by an admissions process that does not consider the concentrations of poverty at the attended school. *See, e.g.*, Scott J. Peters & Kenneth G. Engerrand, *Equity and Excellence: Proactive Efforts in Identification of Underrepresented Students for Gifted and Talented Services*, 60(3) GIFTED CHILD

The Discovery Expansion resulted in an increase in the percentage of admissions offers given to Asian Americans as well as an increase in the representation of Asian Americans at the Specialized High Schools. J.A. 502. Before the Discovery Expansion, in 2018, Asian Americans were 31.1% of the applicant pool and received 52.2% of the offers. J.A. 77. After the Discovery Expansion, in 2019, even though Asian Americans constituted 30.7% of the applicant pool, they received 52.5% of the total offers. *Id.* Likewise, in 2020, Asian Americans were 31.4% of the applicant pool and received 54.8% of the offers. *Id.* In other words, after the Discovery Expansion, Asian Americans were consistently given offers at a rate considerably higher than their participation in the applicant pool.

In 2019, Asian American students were 7.5 times more likely than Black students to receive an offer to attend a Specialized High School, 5.4 times more likely than Latinx students to receive an offer, and 1.2 times more likely to receive an offer than white students.[12] *See* J.A. 78. In 2020, they were six times more likely than Black students to receive an offer to attend a specialized high school, five times

---

Q. 159, 165 (2016); Rashea Hamilton et al., *Disentangling the Roles of Institutional and Individual Poverty in the Identification of Gifted Students*, 62 GIFTED CHILD Q. 6, 21 (2018).

[12] In 2019, 33.2% of Asian American students who took the SHSAT were offered a spot at a Specialized High School, in comparison to 4.4% of Black students, 6.1% of Latinx students, and 28.2% of white students. *See* J.A. at 78. Therefore, Asian Americans were 7.5 times (33.2 / 4.4) more likely than Black students to receive an offer, 5.4 times (33.2 / 6.1) more likely than Latinx students to receive an offer, and 1.2 (33.2 / 28.2) times more likely to receive an offer than white students.

more likely than Latinx students to receive an offer, and 1.2 times more likely than white students to receive an offer. J.A 78.

### III.    Procedural History

On December 13, 2018, Plaintiffs commenced this action, claiming that the Discovery Expansion violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution by discriminating against Asian Americans. J.A. 503.

The District Court denied Plaintiffs' preliminary injunction motion on February 25, 2019, finding that Plaintiffs were not likely to succeed on their Equal Protection claim because binding precedent rejects Plaintiffs' argument "that a facially neutral policy seeking to improve racial diversity necessarily carries with it discriminatory intent." *McAuliffe I*, 364 F. Supp. 3d at 278.

On September 25, 2019, the District Court ordered that discovery in this case be bifurcated, with Phase I of the discovery addressing whether the Discovery Expansion had any discriminatory effect and Phase II focusing on the NYCDOE's motivations for adopting the Discovery Expansion. J.A. 39.

On March 24, 2020, the District Court granted Intervenors-Appellees' motion to intervene as Defendants seeking to defend reforms to the Discovery Program. *Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio*, No. 18-CV-11657-ER,

2020 WL 1432213 (S.D.N.Y. Mar. 24, 2020) ("*McAuliffe II*").[13] In seeking to intervene, Intervenors-Appellees highlighted that they are "membership and/or community-based organizations that support education equity and whose constituents include students and families of racial and ethnic groups who are underrepresented in the Specialized High Schools." Memo. of Law in Support of Mot. to Intervene as Defs., *Christa McAuliffe Intermediate Sch. PTO, Inc. v. Adams*¸ No. 1:18-CV-11657-ER, (S.D.N.Y. May 3, 2019), ECF No. 101, at 7. After the close of Phase I of discovery, on October 1, 2021, NYCDOE moved for, and the District Court granted, summary judgment. J.A. 42–43. The District Court found that the Discovery Expansion is facially race-neutral, as it "do[es] not classify students by race" and further noted that "Plaintiffs do not allege that [the Discovery Expansion is] being administered in a racially discriminatory way." *McAuliffe III*, 2022 WL 4095906, at *5. As such, under this Court's precedent, Plaintiffs were required to show that the reforms "(1) have resulted in a discriminatory effect, and (2) were motivated by a discriminatory purpose." *Id.* at *9. The District Court concluded summary judgment was warranted under this standard, as it was clear

---

[13] The following intervenors are not appellees in this appeal: Elizabeth Pierret, on behalf of her minor son O.R., Odunlami Showa, on behalf of his minor child A.S., Tiffany Bond, on behalf of her minor child K.B, Lauren Mahoney, on behalf of her minor children N.D.F and N.E.F, and Rosa Velasquez, on behalf of her minor child C.M.

beyond triable dispute that the Discovery Expansion did not have a discriminatory effect on Asian Americans. *Id.* at *9, *12.

The District Court further recognized that Plaintiffs' argument that "discriminatory effect can be shown by way of 'unequal treatment'—without any evidence of aggregate harm—conflicts with Supreme Court precedent and lacks any support." *Id.* at *8. The District Court held that the Discovery Expansion does not treat students differently on the basis of race because "[d]isadvantaged students attending schools with an ENI of 0.6 or more have the same eligibility to participate in the [Discovery] Program [a]nd all disadvantaged students attending schools with an ENI of less than 0.6 are equally prohibited from participating in Discovery, *regardless of their race*." *Id.* (emphasis added). Thus, the District Court concluded, "ENI, at its core, is a measure of economic disadvantage—not of a school's racial composition." *Id*. CACAGNY now appeals.

## SUMMARY OF THE ARGUMENT

This lawsuit aims to deter school systems from pursuing race-neutral reforms to equalize access to publicly-funded educational opportunities, even when those reforms are urgently necessary to remedy the longstanding denial of equal educational opportunities to Black, Latinx, and other underserved students,

including many Asian American students.[14] In bringing this appeal, CACAGNY is attempting to entrench a flawed status quo that fails to identify many qualified students.

To achieve this goal, CACAGNY attempts to rewrite Equal Protection law. CACAGNY first argues that it need not show that the Discovery Expansion had a discriminatory effect on Asian Americans in order to prove that this race-neutral, evenly-applied policy is unconstitutional. Second, CACAGNY argues that it can show that Asian Americans were in fact adversely affected by the Discovery Expansion by pointing to insignificant trends at two of the eight Specialized High Schools, even though the undisputed facts demonstrate that the Discovery Expansion has yielded an even greater share of offers for Asian Americans to attend the Specialized High Schools. Third, similarly relying on cherry picked data alone, CACAGNY argues that the Discovery Expansion treats Asian American students unequally because the ENI measure used by NYCDOE is a proxy for race, and

---

[14] *See, e.g., Health of Asians and Pacific Islanders*, NYC.GOV, 17 (2021), https://www.nyc.gov/assets/doh/downloads/pdf/episrv/asian-pacific-islander-health-2021.pdf (visited Mar. 21, 2023); J.A. 34 n.2 (referring to a press release wherein CAAAV Organizing Asian Communities noted the importance of abandoning test-only admissions so that "[s]tudents of color, including low-income Asian American students from ethnic communities less represented at the specialized high schools, would have a more equitable chance at attending these schools").

therefore the policy changes should be viewed and analyzed as if they were not race-neutral.

Precedent forecloses each argument.[15] First, CACAGNY is required to show that the Discovery Expansion has an adverse racially discriminatory effect on Asian Americans. *See Hayden*, 180 F.3d at 48 (holding that a "facially neutral statute violates Equal Protection if it was motivated by discriminatory animus *and* its application results in a discriminatory effect") (citing *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 264–65 (1977)) (emphasis added). It has failed to do so. Under the Discovery Expansion, Asian Americans continue to be more likely than students from any other racial group to be admitted to the Specialized High Schools.

Second, because the Discovery Expansion is a race-neutral and evenly-applied policy, CACAGNY must show that the policy had a discriminatory effect on Asian American students seeking admission to the Specialized High Schools as a whole. It is well-established that discriminatory effect is determined by the challenged law or policy's impact on a group-wide basis. *See Washington v. Davis*,

---

[15] "This Court has generally recognized three types of equal protection violations: (1) a facially discriminatory law; (2) a facially neutral statute that was adopted with a discriminatory intent and applied with a discriminatory effect . . . ; and (3) a facially neutral law that is enforced in a discriminatory manner." *Chabad Lubavitch of Litchfield Cnty., Inc. v. Litchfield Historic Distr. Com'n*, 768 F.3d 183, 199 (2d Cir. 2014) (citations omitted). The first and third types of violation are not at issue here.

426 U.S. 229, 242 (1976) (describing discriminatory effect as whether a law "may affect a greater proportion of one race than another."); *Anderson ex rel. Dowd v. City of Boston*, 375 F.3d 71, 89 (1st Cir. 2004) ("Courts can only infer that an invidious racial purpose motivated a facially neutral policy when that policy creates disproportionate racial results."). CACAGNY cannot manufacture discriminatory effect by pointing to a possible impact on individual students at only two of the eight Specialized High Schools.

Third, the Discovery Program's use of the ENI as a measure of disadvantage does not transform the facially race-neutral policy into a facially discriminatory one, nor does it excuse CACAGNY from its obligation to demonstrate discriminatory effect. The ENI is a measure of economic disadvantage, not a proxy for race, and does not treat Asian Americans differently. The small sample of disproportionately Asian American middle schools CACAGNY highlights constitute only about a tenth of the middle schools that are excluded from the Discovery Expansion for not meeting the measure of concentrated poverty.[16] And more than half of Asian-American-majority middle schools in New York City are eligible under the

---

[16] CACAGNY's brief notes that "eleven of the twenty-four majority-Asian-American middle schools were excluded by the ENI restriction." App. Op. Br. at 52 (citing J.A. 305–06, 307 n.6). It also notes that, at that time, 515 out of 621 middle schools were eligible for the Discovery Expansion. *Id.*; *see also* J.A. 336. Therefore, 106 schools were ineligible, meaning that the eleven schools CACAGNY highlights constitute 10.4% of the ineligible middle schools.

Discovery Expansion.[17] Simply put, CACAGNY still needs to show discriminatory effect, and it has not.

Finally, this appeal is limited to the lower court's ruling on the absence of a discriminatory effect. Despite CACAGNY's attempt to make it so, the issue of the policy makers' motivations is not at issue here. In any event, the Discovery Expansion did not reflect any discriminatory intent. Contrary to the CACAGNY's claims, courts have routinely held that race-neutral strategies to address racial inequities do not constitute intentional discrimination and are constitutionally permissible. *See, e.g.*, *Ass'n for Educ. Fairness v. Montgomery Cnty. Bd. of Educ.*, 560 F. Supp. 3d 929, 951 (D. Md. 2021) (holding local governments are permitted to "take race into consideration in its policymaking and not run afoul of the Equal Protection Clause.") (citing *Doe ex rel. Doe v. Lower Merion Sch. Dist.*, 665 F.3d 524, 548 (3d. Cir. 2011) ("Designing a policy with racial factors in mind does not constitute racial classification if the policy is facially neutral and is administered in a race-neutral fashion.").

Summary judgment for the Defendants-Appellees is proper. Accordingly, this Court should affirm.

---

[17] CACAGNY highlights that eleven out of the twenty-four majority-Asian-American middle schools are ineligible for the Discovery Program. *See* App. Op. Br. at 52, meaning that a majority (thirteen out of twenty-four) are eligible.

## STANDARD OF REVIEW

This Court reviews the District Court's grant of summary judgment *de novo*, viewing the evidence in the light most favorable to the non-moving party and drawing all inferences in their favor. *See Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 168–69 (2d Cir. 2006). "Summary judgment is appropriate only if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Bey v. City of New York*, 999 F.3d 157, 164 (2d Cir. 2021) (quoting Fed. R. Civ. P. 56(a)).

## ARGUMENT

This Court should affirm the District Court's grant of summary judgment for the Defendants-Appellees because it is undisputed that the Discovery Expansion is facially race-neutral, and CACAGNY has not shown that the program has a discriminatory effect on Asian Americans. The law in this Circuit is clear: to establish an Equal Protection violation when challenging a facially race-neutral policy, a plaintiff must prove both that the law results in a discriminatory effect and it is motivated by a discriminatory purpose. *See Hayden*, 180 F.3d at 48; *see also Chabad Lubavitch of Litchfield Cnty.*, 768 F.3d at 199 (recognizing as a type of Equal Protection violation "a facially neutral statute that was adopted with discriminatory

intent *and* applied with discriminatory effect") (emphasis added).[18] CACAGNY concedes that the Discovery Expansion is facially race-neutral. *See, e.g.*, Appellants' Op. Br. at 13; J.A. 18. And, as the District Court noted, Plaintiffs "do not allege that the way [ Discovery Expansion is] being administered in a racially discriminatory way." *McAuliffe III*, 2022 WL 4095906, at *5. Given this, CACAGNY must prove that the Discovery Expansion had a discriminatory effect and was enacted with discriminatory intent. Since CACAGNY has failed to show discriminatory effect—the only issue before the Court on appeal—this Court should affirm the grant of summary judgment for the Defendants-Appellees.

## I. The Discovery Expansion Does Not Have a Discriminatory Effect on Asian Americans and Does Not Violate the Equal Protection Clause.

### A. CACAGNY Must Show That the Challenged Policy Has an Adverse Racially Discriminatory Effect to Sustain an Equal Protection Claim in This Circuit.

Plaintiffs challenging a facially race-neutral policy under the Equal Protection Clause must show both that the policy had a discriminatory effect, and that its

---

[18] All parties to this appeal are bound by the law of this Circuit, and Intervenors-Appellees apply it here. There may be circumstances where, from Intervenors-Appellees' perspective, a law or policy enacted for the specific purpose of harming a group of people based on race or ethnicity should constitute an Equal Protection violation without any further inquiry into the law's impact. But that is clearly not this case where the purported "discriminatory intent" is NYCDOE's effort to take modest steps to begin to remedy the stark and persisting under-identification of Black and Latinx students at Specialized High Schools. In any event, this Court's precedent clearly imposes a discriminatory impact requirement for all equal protection claims.

enactment was motivated by a discriminatory purpose. *See Hayden*, 180 F.3d at 48 (citing *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 264–65 (1977)); *see also United States v. City of Yonkers*, 96 F.3d 600, 611 (2d Cir. 1996) ("A plaintiff is required to show not only that the state action complained of had a disproportionate or discriminatory impact but also that the action was taken with intent to discriminate."). CACAGNY now erroneously asserts that it need not demonstrate a discriminatory effect at all. App. Op. Br. at 41. However, CACAGNY conceded below that it is required to show discriminatory effect. *See* J.A. 20 ¶ 61 (Plaintiffs' complaint stating that "facially neutral state action violates the Equal Protection Clause when it has a disparate impact upon a particular racial group and was enacted with a racially discriminatory purpose") (citing *Arlington Heights*, 429 U.S. 252, 264–65 (1977); *Brown v. City of Oneonta*, 221 F.3d 329, 337 (2d Cir. 2000)); Premotion Conference Hr'g Tr. 12:7–10, ECF No. 105 (Plaintiffs' Counsel agreeing "I do think that the Second Circuit, as opposing counsel has indicated, does have language indicating that disparate impact is a prerequisite to prevailing under an *Arlington Heights* theory.").

As it is well-settled law in this Circuit that one must show a discriminatory effect as an element of intentional discrimination under the Equal Protection Clause, Black and Latinx plaintiffs alleging discrimination have routinely been held to this burden. *See, e.g.*, *Atkins v. Westchester Cnty. Dep't of Soc. Serv.*, 31 F. App'x 52,

54 (2d Cir. 2002) (granting summary judgment against Black employees' Equal Protection claim challenging entrance exam because plaintiffs failed to make a "prima facie showing that the [ ] exam [ ] exerted a disparate impact on African-American test-takers"); *Chavez v. Illinois State Police*, 251 F.3d 612, 645 (7th Cir. 2001) (granting summary judgment against Black and Hispanic motorists because the court found that plaintiffs' statistics did not show that the state's police drug interdiction unit's traffic stop practice had a discriminatory effect on plaintiffs). Likewise, the District Court held CACAGNY to the same burden, which it failed to meet.

Indeed, in challenges to equitable admissions reforms for selective K-12 programs, courts in other circuits have likewise recognized the discriminatory effect requirement. *See, e.g.*, *Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of City of Bos.*, 996 F.3d 37, 46 (1st Cir. 2021) (holding that plaintiffs were not likely to succeed in challenging an admissions policy because the policy had no discriminatory effect "as compared to a random distribution of invitations" to all students) (hereinafter "*Boston Parent II*"); *Ass'n for Educ. Fairness v. Montgomery Cnty. Bd. of Educ.*, No. 8:20-CV-02540-PX, 2022 WL 3019762, at *7 (D. Md. July 29, 2022), *motion for relief from judgment denied*, No. 8:20-CV-02540-PX, 2022 WL 17740402 (D. Md. Dec. 16, 2022) (finding no discriminatory effect where, under the challenged admissions reforms, "Asian American students consistently []

occupied a proportionally greater share of students admitted into the magnet as compared to their representation in applicant pool"). Tellingly, CACAGNY's brief fails to address these cases and their holdings.

As set forth in more detail below, under any metric for measuring discriminatory effect, the District Court correctly held that CACAGNY failed to show that the Discovery Expansion had a discriminatory effect, and this Court should affirm the grant of summary judgment.

> **B.    The Correct Way to Measure Discriminatory Effect Is to Compare the Relevant Applicant Pool to the Share of Students Admitted to the Selective Program.**

C.      In examining whether a policy has a discriminatory effect, the proper analysis is a comparison of the affected group's representation in the admissions pool against its representation among those selected for the program. *See Coal. for TJ. v. Fairfax Cnty. Sch. Bd.*, No. 22-1280, 2022 WL 986994, at *3 (4th Cir. Mar. 31, 2022) (Heytens, J., concurring) (noting that the "obviously relevant comparator for determining whether this race neutral admissions policy has an outsized impact on a particular racial group is the percentage of applicants versus percentage of offers"); *Montgomery Cnty.*, 2022 WL 3019762, at *7 (comparing the share of Asian Americans admitted into the magnet program to the share of Asian Americans in the

applicant pool);[19] *Vaughns v. Bd. of Educ. of Prince George's Cnty.,* 574 F. Supp. 1280, 1304 (D. Md. 1983), *aff'd in part, rev'd in part on other grounds*, 758 F.2d 983 (4th Cir. 1985) (comparing "[B]lack children . . . in the [gifted and talented] program relative to their population in the school system as a whole"). This method of analysis "targets more directly the core question for assessing disparate impact: whether members of one group have, proportionally, more difficulty securing admission than others." *Coal. for TJ*, 2022 WL 986994, at *3 (Heytens, J., concurring). In other words, calculating the proportion of applicants from each racial group who were admitted enables the court to compare admissions rates among racial groups; if applicants from a certain group are far less likely to be admitted than their peers, the challenged policy may be artificially depressing that group's chances of admission.

D.    The Department of Education's Office for Civil Rights also uses the comparison between the applicant pool and the pool of admitted students to determine disparate impact in the K-12 context for purposes of administrative proceedings under Title VI. *See, e.g.*, *Gallup-McKinley Cnty. Sch. Resol.*, U.S. Dep't of Educ., No. 08-11-5002 at *12 (2017) (comparing "the number of American Indian

---

[19] The lower court incorrectly stated that the district court in *Montgomery County* found discriminatory effect. *See* J.A. 511 at 16. To the contrary, that case was dismissed because the Plaintiff's discriminatory effect allegations were not plausible. *Montgomery Cnty.*, 2022 WL 3019762, at *7.

students enrolled in the District and the number of American Indian students who participate in the District's [gifted and talented] program and honors and AP courses"). Similarly, in employment discrimination cases, courts calculate disparate impact by comparing the applicant pool to the group of applicants who are selected. *See, e.g.*, *Hayden*, 180 F.3d at 46, 51–52 (affirming a dismissal at the motion to dismiss stage for failure to plead that an employment selection exam's results reflected a disparate impact relative to representation in the candidate pool); *Pers. Adm. of Mass. v. Feeney*, 442 U.S. 256, 270 (1979) (comparing the percentage of applicants who were women to the percentage of the people selected who were women).

E.     In line with this precedent, this Court should analyze discriminatory effect by comparing the pool of students who applied to the Specialized High Schools—*i.e.*, the students who took the SHSAT exam—with the pool of students admitted to the Specialized High Schools. Using this comparison, and as discussed more fully below, the Court must affirm the District Court's determination that the Discovery Expansion had no discriminatory effect on Asian Americans.

### C.     CACAGNY Has Not Shown Discriminatory Effect.

F.     Even with the Discovery Expansion, Asian Americans continue to be more likely to be admitted to a Specialized High School than students of any other racial or ethnic group. Indeed, after the Discovery Expansion, Asian Americans are

consistently given offers at a rate considerably higher than their participation in the applicant pool. J.A. 502. In 2019, the first year of the Discovery Expansion, Asian Americans were 30.7% of the applicant pool and received 52.5% of the offers to attend one of the Specialized High Schools. *Id.* That year, Asian Americans were 7.5 times more likely than Black students to receive an offer to attend a Specialized High School, 5.4 times more likely than Latinx students to receive an offer, and 1.2 times more likely to receive an offer than white students.[20] *See* J.A. 78.

G.     In 2020, Asian Americans were an even larger share of the pool of students admitted to the Specialized High Schools as compared to their share of the applicant pool; that year, Asian Americans were 31.4% of the applicant pool and received 54.8% of the offers. J.A. 77. They were six times more likely than Black students to receive an offer to attend a Specialized High School, five times more likely than Latinx students to receive an offer, and 1.2 times more likely than white students to receive an offer.[21] *See* J.A 78.

---

[20] In 2019, 33.2% of Asian American students who took the SHSAT were offered a spot at a Specialized High School, in comparison to 4.4% of Black students, 6.1% of Latinx students, and 28.2% of white students. *See* J.A. at 78. Therefore, Asian Americans were 7.5 times (33.2 / 4.4) more likely than Black students to receive an offer, 5.4 times (33.2 / 6.1) more likely than Latinx students to receive an offer, and 1.2 (33.2 / 28.2) times more likely to receive an offer than white students. *See id.*

[21] In 2020, 31.9% of Asian American students who took the SHSAT were offered a spot at a Specialized High School, in comparison to 5.4% of Black students, 6.4% of Latinx students, and 23.7% of white students. *See id.* Therefore, Asian Americans were six times (31.9 / 5.4) more likely than Black students to receive an offer, five

H.    Thus, when comparing the applicant pool to the pool of admitted students, the record is devoid of any evidence that the Discovery Expansion had a discriminatory effect on Asian Americans across the board. *See Montgomery Cnty.*, 2022 WL 3019762, at *7 ("[T]he Court cannot see how the [challenged plan] visited a disproportionate *burden* on Asian American students when the percentage of admitted Asian American students so substantially outpaces the percentage representation among all applicants."). Therefore, this Court should affirm the District Court's determination that the Discovery Expansion had no discriminatory effect on Asian Americans. *See id.* (finding no discriminatory effect where, under the challenged reforms to the admissions plan for magnet middle schools, "Asian American students consistently . . . occupied a proportionally greater share of students admitted into the magnet as compared to their representation in the applicant pool").

I.    Even if the Court were to adopt the flawed before-and-after test of discriminatory effect posited by CACAGNY and the other Plaintiffs in the District Court, there is still no discriminatory effect on Asian Americans, as Asian American applicants' chances of admission to the Specialized High Schools increased with the

---

times (31.9 / 6.4) more likely than Latinx students to receive an offer, and 1.3 (31.9 / 23.7) times more likely to receive an offer than white students. *See id.*

adoption of the Discovery Expansion.[22] As CACAGNY concedes, *see* Appellants'
Op. Br. at 46 n.35, compared to 2018, when the Discovery Expansion was not yet in
place, the percentage of offers received by Asian Americans, the offer-rate among
Asian Americans, and the spread between Asian Americans' share of offers and
share of test-takers all increased in the two years following the implementation of
the Discovery Expansion. J.A. 268.

### D. Discriminatory Effect Cannot Be Shown Through Isolated Examples at Two of the Eight Specialized High Schools.

J. Despite conceding that the Discovery Expansion did not lead to
reduction of Asian-American students admitted to the Specialized High Schools,
CACAGNY incorrectly argues that discriminatory effect can be shown by an
insignificant impact for applicants to just two of the eight schools. App. Op. Br. at
56. It insists that the District Court erred in disregarding alleged harm to individual

---

[22] Because CACAGNY incorrectly asserts that it does not need to show
discriminatory effect, it argues that this Court need not resolve the disagreement
between the parties about the correct approach for evaluating discriminatory effect.
App. Op. Br. at 46 n.35. Below, Plaintiffs argued that the "proper approach for
evaluating disparate impact is to compare Asian-American representation before and
after the challenged changes," while Defendants advocated that the District Court
"compare the proportion of Asian Americans in the 'applicant pool' to the proportion
who were given offers." *Id.* As CACAGNY has conceded, there is no discriminatory
effect under either approach. *See* App. Op. Br. at 46 n.35 ("[N]either approach
showed an aggregate reduction in Asian-American representation in the specialized
high schools.").

Asian American students who were unable to go to the two most competitive Specialized High Schools, Stuyvesant and Bronx Science. *Id.*

K.   As the District Court held, CACAGNY's attempt to create discriminatory effect based on insignificant "trends in two of the eight [Specialized High] Schools cannot "sustain [its] disparate impact claim." *McAuliffe III*, 2022 WL 4095906, at *12. As discussed above, to sustain an Equal Protection claim involving a facially race-neutral policy in this circuit, a plaintiff must show a discriminatory effect. From the Supreme Court's earliest consideration, discriminatory effect is measured by the challenged law's impact on a group-wide basis. *See Washington*, 426 U.S. at 242 (describing discriminatory effect as whether a law "may affect a greater proportion of one race than another."). Courts have continued to evaluate discriminatory effect using aggregate class-wide data, not cherry-picked effects on individual people. *See Anderson*, 375 F.3d at 89 ("Courts can only infer that an invidious racial purpose motivated a facially neutral policy when that policy creates disproportionate racial results.").

L.   Any policy change is likely to have an effect—positive or negative—on at least one person. Yet, CACAGNY argues that any facially neutral policy change that yields a different result for one or a few members of a protected class has a discriminatory effect. That is not the law. "[S]uch a reduction is not a consequence that the caselaw considers a disparate impact." *Bos. Parent Coalition*

31

*for Acad. Excellence Corp. v. Sch. Comm. of Boston,* No. 21-10330-WGY, 2021 WL 4489840, at *15 (D. Mass. Oct. 1 2021) (hereinafter "*Boston Parent III*"); *see also Boston Parent II*, 996 F.3d at 46 (noting that there was no discriminatory effect on white and Asian American students where those students were still markedly overrepresented, albeit less so, in the exam schools after the admissions policy change necessitated by the pandemic); *Anderson*, 375 F.3d at 90 ("Isolated examples that only show a small net loss of seats to white students in selected schools is a far cry from showing that the [challenged plan] disproportionately affects white students in the [school district] system.").

M.    As already set forth, proving that a facially race-neutral policy is discriminatory requires a demonstration of discriminatory effect. While CACAGNY may be able to point to isolated instances where individual students fared worse under a new policy, at the same time, there are no doubt many Asian American applicants who fared *better*. This is why a showing of disparate impact always requires looking at the group overall, rather than the experience of a handful of individuals, to determine whether a law is in fact having a detrimental effect on the class that is claiming discrimination. When courts evaluate "a facially race-neutral policy, the impact of race on an individual outcome is not always immediately clear" and thus, "courts can only infer that an invidious racial purpose motivated a facially

32

race-neutral policy when that policy creates disproportionate racial results." *Anderson*, 375 F.3d at 89.

N.     By focusing on a policy's effect on a few individuals, CACAGNY's argument transforms "a variable consequence" of a defendant's policies into a constitutional "baseline against which all future [outcomes] must comport," thereby entrenching the status quo. *Boston Parent III*, 2021 WL 4489840, at *15 n.20. Using a current government policy to "create[] a floor against which all future policies will be judged [risks making it] exceedingly difficult for government actors to change existing policies that have a real (albeit unintentional) disparate impact." *Coalition for TJ*, 2022 WL 986994, at *3. The "Equal Protection Clause is not a bulwark for the status quo." *Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of City of Bos.*, No. 21-cv-10330, 2021 WL 1422827, at *14 n.18 (D. Mass. Apr. 15, 2021) ("*Boston Parent I*"), *opinion withdrawn for other reasons*, *Bos. Parent Coalition for Acad. Excellence Corp. v. Sch. Comm. of City of Bos.*, No. 21-10330-WGY, 2021 WL 3012618 (D. Mass. July 9, 2021); *cf. Griggs v. Duke Power Co.*, 401 U.S. 424, 430 (1971) (explaining, in the employment context, that disparate impact liability targets policies that "operate to 'freeze' the status quo of prior discriminatory employment practices").

O.     Furthermore, selectively focusing on variations only at the two most competitive of the eight Specialized High Schools does not establish that the

Discovery Expansion had a discriminatory effect on Asian Americans. CACAGNY challenges the Discovery Expansion as a whole, not school by school, yet it cherry picks data from a few schools in order to manufacture a discriminatory impact. *See* J.A. 20 at ¶ 62. Likewise, the requested relief concerns the Specialized High School program as a whole, not by individual school. J.A. 22.

P.      CACAGNY does not address the cases above demonstrating that disparate impact is shown by looking at the overall impact on a racial group. Instead, it only argues that the District Court's reliance on *Sharif v. New York State Education Department* was in error. *Sharif* is a disparate impact case under Title IX that holds "[i]n a case alleging statewide discrimination, [ ] focus[ing on individual schools and counties] does not rebut plaintiffs' statewide prima facie case." 709 F. Supp. 345, 362 (S.D.N.Y. 1989). CACAGNY argues that *Sharif* is distinguishable because it was a disparate impact case, whereas here, CACAGNY is alleging discriminatory intent and an Equal Protection violation. But, as explained above, CACAGNY must show discriminatory effect to prevail on its intentional discrimination claim under the Equal Protection Clause. And, because its claim applies to the entire Discovery Expansion, the District Court's analogy to *Sharif* and the body of case law describing the correct method for showing discriminatory effect is sound.

Q.      Given that CACAGNY's attempts to manufacture legally cognizable discriminatory effect have all failed, this Court should affirm the District Court's grant of summary judgment for the Defendants-Appellees.

**E.      This Court Should Reject CACAGNY's Argument That the Discovery Expansion Treats Asian Americans Unequally and Thus Should Be Subjected to the Standard Applied to Facially Discriminatory Policies Rather Than Race-Neutral Policies.**

Having failed to establish that the Discovery Expansion had a discriminatory effect on Asian Americans, CACAGNY attempts to shoehorn arguments about the motivations of policy makers into its appeal by arguing that the Discovery Expansion intentionally treated Asian Americans unequally. *See* App. Op. Br. at 53.

Despite conceding that Discovery Expansion is facially neutral, CACAGNY first argues that NYCDOE "purposefully imposed unequal treatment based on race," *id.* at 50, claiming that the ENI serves as a proxy for race as it excluded some majority-Asian-American middle schools. App. Op. Br. at 52–53, 55. And thus, the Discovery Expansion should be treated as "constitutionally suspect," just as an "express racial classification." App. Opp. Br. at 51. CACAGNY is incorrect.

The Discovery Expansion and the use of the ENI are facially race-neutral policies, as CACAGNY concedes. Thus "good faith [is] presumed . . ." *Regents of Univ. of California v. Bakke*, 438 U.S. 265, 318–19 (1978). On the other hand, "[p]roxy discrimination is a form of facial discrimination [that] arises when the defendant enacts a law or policy that treats individuals differently on the basis of

35

seemingly neutral criteria that are so closely associated with the disfavored group that discrimination on the basis of seemingly neutral criteria is, constructively, facial discrimination against the disfavored group." *Pac. Shores Prop., LLC v. City of Newport Beach*, 730 F.3d 1142, 1160 n.23 (9th Cir. 2013).

The record does not demonstrate that ENI operates in any way as a proxy for race such that it is constructively facial discrimination against Asian Americans. CACAGNY complains that eleven disproportionately Asian American middle schools were rendered ineligible for the Discovery program by the Discovery Expansion, App. Op. Br. at 52, but those eleven schools are only about a tenth of the middle schools that are excluded from the Discovery Expansion, J.A. 337. Moreover, as CACAGNY concedes, the majority of "heavily Asian-American" middle schools were not rendered ineligible. App. Op. Br. 53. Merely characterizing indicia of concentrated poverty as a racial proxy, without evidence that it is so, does not transform a facially race-neutral, evenly-applied policy into one imbued with discriminatory intent.

Here, the ENI does not turn on race, but on concentrated poverty levels. *See* J.A. 512. As discussed by the District Court and demonstrated by the record before it, the ENI is a measure created by NYCDOE that estimates the percentage of students in that school facing economic hardship. J.A. 245. The ENI is calculated based upon the average of the Economic Need Values (ENV) of the students

attending the school, which is determined by assessing non-race-related factors such as whether the student lives in a household eligible for public assistance from the New York City Human Resources Administration, has lived in temporary housing, has a home language other than English, and is enrolled in a NYCDOE school for the first time within the past four years prior to application. J.A. 246. If none of these factors are met, the student's ENV is calculated by looking at the percentage of families with school-age children in the student's census track whose income is below the calculated poverty income level. *Id.* Race is not factored into any of these indicia. *See id.*

This use of these socioeconomic measures to increase opportunities for all students at schools with concentrated poverty is so clearly constitutional that "the legitimate noninvidious [*sic*] purposes of a law cannot be missed." *Feeney*, 442 U.S. at 275. That socioeconomic measures have some correlation with race does not make them proxies. Indeed, "[o]ne may not simply bootstrap any neutral classification arguably correlated with race, and claiming that it is an impermissible proxy therefor, strip away all forms of diversity." *Boston Parent I*, 2021 WL 1422827, at *14 n.18. "That is neither the spirit nor the letter of the [Equal Protection] doctrine, and to allow such efforts to succeed by delegitimizing other forms of diversity will be the undoing of the doctrine." *Id.*

Additionally, CACAGNY's argument ignores that local governments are permitted to "take race into consideration in its policymaking and not run afoul of the Equal Protection Clause." *Montgomery Cnty.*, 560 F. Supp. 3d at 951 (citation omitted). Awareness of the racial demographics, such as those reflected in ENI bands, does not amount to evidence of discriminatory intent. Moreover, the mere "consideration or awareness of race while developing or selecting a policy . . . is not in and of itself racial classification." *Lower Merion Sch. Dist.*, 665 F.3d at 548.

And even if NYCDOE was motivated by increasing socioeconomic, geographic, and racial diversity in instituting the Discovery Expansion——"the mere invocation of racial diversity as a goal is insufficient to subject [an otherwise race-neutral plan] to strict scrutiny." *Anderson*, 375 F.3d at 87 (holding that strict scrutiny did not apply to an attendance plan adopted based on desire to promote student choice, equitable access to resources for all students, and racial diversity.)

CACAGNY's reliance on *N.C. State Conf. NAACP v. McCrory*, 831 F.3d 204, 232 (4th Cir. 2016) is equally misplaced. App. Op. Br. 57. In *McCrory*, the Fourth Circuit found that a revision to North Carolina's voting rights laws violated the Equal Protection Clause. *McCrory*, 831 F.3d at 204. Noting that the State's "new provisions target African Americans with almost surgical precision" and in essence "took away [minority voters'] opportunity because [they] were about to exercise it," the court found that the State's action bore the mark of intentional discrimination.

*Id.* at 214–15 (citations omitted). There is no such "surgical precision" here or even any record evidence that the changes to ENI that were adopted as part of the Discovery Expansion targeted either disproportionately Asian American middle schools or Asian American students in general. CACAGNY itself admits that most "heavily Asian-American" middle schools remained Discovery eligible, App. Op. Br. 53, and "[a] higher percentage of Asian American test takers received offers in 2019 and 2020 than any other major ethnic or racial group." J.A. 514. The contrast with *McCrory* could not be starker.

In sum, ENI is not a proxy for race, enrollment in a middle school with less concentrated poverty is not a protected class, there is nothing nefarious about policymakers being aware of the demographic implications of their policy decisions, and—in any event—CACAGNY's discriminatory intent arguments are not properly before this Court.

## CONCLUSION

At issue before this Court is whether the Discovery Expansion had a discriminatory effect on Asian Americans. The record establishes that it did not. Accordingly, the District Court did not err in granting summary judgment for the Defendants-Appellees. The Court should reject CACAGNY's attempts to rewrite Equal Protection jurisprudence to entrench the status quo and deter school systems from pursuing race-neutral reforms to equalize access to publicly-funded

educational opportunities. It should go without saying that a litigant should not be allowed to leverage the Equal Protection Clause to prevent all children from enjoying the Equal Protection of the law.

For the foregoing reasons, Intervenors-Appellees respectfully request that this Court affirm the District Court's grant of summary judgment.

DATED:  April 14, 2023

Janai S. Nelson
*Director-Counsel*
Samuel Spital
Rachel Kleinman
Kevin Jason
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
40 Rector St., 5th Floor
New York, NY 10006
Tel: (212) 965-2200

Jin Hee Lee
Michaele N. Turnage Young
Molly M. Cain
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
700 14th Street NW, Suite 600
Washington, DC 20005
Tel: (202) 682-1300

Sarah Hinger
AMERICAN CIVIL LIBERTIES UNION
125 Broad Street, 18th Floor
New York, NY 10004
Tel.: (212) 519-7882

Stefanie D. Coyle
Arthur Eisenberg
Emma Hulse *
NEW YORK CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street,
19th Floor
New York, NY 10004
Tel: (212) 607-3300
*Admission Pending

Francisca D. Fajana
LATINOJUSTICE PRLDEF
475 Riverside Drive, Suite 1901
New York, NY 10115
Tel: (212) 219-3360

Elizabeth A. Ritvo
BROWN RUDNICK LLP
One Financial Center
Boston, MA 02111
Tel: (617) 856-8249

John G. Doyle
BROWN RUDNICK LLP
601 Thirteenth Street NW
Washington, D.C. 20005
Tel: (202) 536-1700

Caitlin Felise C. Ramiro
Samuel J. Hickey
BROWN RUDNICK LLP
7 Times Square
New York, NY 10036
Tel: (212) 209-4800

*Counsel for Intervenors-Appellees*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32 (a)(7)(C), I certify that this brief is

proportionally spaced, has a typeface of 14 points and contains 9,642 words.

DATED:  April 14, 2023                    BROWN RUDNICK LLP

By:  /s/ *Elizabeth A. Ritvo*
      Elizabeth A. Ritvo
      Counsel for *Intervenors-Appellees*

## CERTIFICATE OF SERVICE

I hereby certify that on April 14, 2023, I electronically filed the foregoing with the Clerk of the United States Court of Appeals for the Second Circuit using the CM/ECF system, which sent notification of such filing to all registered CM/ECF users.


DATED:  April 14, 2023          BROWN RUDNICK LLP


By:  /s/ *Elizabeth A. Ritvo*
     Elizabeth A. Ritvo
     Counsel for *Intervenors-Appellees*