# 22-2649

## United States Court of Appeals
## for the Second Circuit

CHINESE AMERICAN CITIZENS ALLIANCE OF
GREATER NEW YORK,

*Plaintiff-Appellant,*

*and*

CHRISTA MCAULIFFE INTERMEDIATE SCHOOL PTO, INC.,
ASIAN AMERICAN COALITION FOR EDUCATION, PHILLIP YAN
HING WONG, YI FANG CHEN, CHI WANG,

*Plaintiffs,*

*against*

ERIC L. ADAMS, in his official capacity as Mayor of New
York, RICHARD A. CARRANZA, in his official capacity as
Chancellor of the N.Y. City Department of Education,

*Defendants-Appellees,*

(caption continued on inside cover)

On Appeal from the United States District Court
for the Southern District of New York

**BRIEF FOR CITY APPELLEES**

CLAUDE S. PLATTON
DEBORAH A. BRENNER
PHILIP W. YOUNG
  *of Counsel*

April 14, 2023

HON. SYLVIA O. HINDS-RADIX
*Corporation Counsel*
*of the City of New York*
Attorney for City Appellees
100 Church Street
New York, New York 10007
(212) 356-2375 or -2502
phyoung@law.nyc.gov

*and*

TEENS TAKE CHARGE, DESIS RISING UP AND MOVING, HISPANIC FEDERATION, ELIZABETH PIERRET, on behalf of her minor son O.R., ODUNLAMI SHOWA, on behalf of his minor child A.S., TIFFANY BOND, on behalf of her minor child K.B., LAUREN MAHONEY, on behalf of her minor children N.D.F. and N.E.F., ROSA VELASQUEZ, on behalf of her minor child C.M., COALITION FOR ASIAN AMERICAN CHILDREN AND FAMILIES,

*Intervenors-Defendants-Appellees.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................iii

PRELIMINARY STATEMENT ............................................................ 1

ISSUE PRESENTED FOR REVIEW ..................................................... 4

STATEMENT OF THE CASE ................................................................ 4

    A.  DOE's facially neutral changes to the Discovery Program ........ 4

        1. New York City's specialized high schools and their
           admissions process .................................................................. 4

        2. The specialized high schools' persistent and growing
           lack of racial, geographic, and socioeconomic diversity ......... 7

        3. DOE's changes to the Discovery Program for
           specialized high school admissions ........................................ 9

    B.  Plaintiffs' equal protection challenge to DOE's facially
       neutral and evenhandedly applied policy ............................... 13

        1. Plaintiffs' complaint, alleging discriminatory intent
           and a discriminatory effect on Asian-American
           applicants to the SHSs ........................................................ 13

        2. The evidence that DOE's policy changes had no
           discriminatory effect on Asian-American students and,
           if anything, benefited them .................................................. 16

        3. The district court's grant of summary judgment to the
           City ..................................................................................... 20

STANDARD OF REVIEW  AND SUMMARY OF ARGUMENT .......... 24

ARGUMENT ...................................................................................... 27

i

## TABLE OF CONTENTS (cont'd)

**Page**

THE DISTRICT COURT PROPERLY GRANTED
SUMMARY JUDGMENT TO THE CITY ..................................... 27

A.  Since plaintiffs sought to upend a facially neutral and
    evenly applied policy on equal protection grounds, they
    were obliged to show that the policy has a discriminatory
    effect. ................................................................................ 28

B.  The district court correctly concluded that, as a matter of
    law, DOE's changes to the Discovery Program had no
    discriminatory effect on Asian-American admissions. ............ 31

C.  Plaintiffs' attempts to salvage their case are unavailing. ....... 36

    1. For this type of equal protection claim, plaintiffs were
       required to establish discriminatory effect ............................ 37

    2. Plaintiffs' unsupported "unequal treatment" theory of
       equal protection liability still requires a showing of
       discriminatory effect. ............................................................. 46

    3. The purported small reduction in Asian-American
       admissions to two specialized high schools does not
       raise a triable issue of fact about discriminatory effect. ....... 52

CONCLUSION ........................................................................... 59

CERTIFICATE OF COMPLIANCE ...................................... 60

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alston v. City of Madison*,
853 F.3d 901 (7th Cir. 2017) .............................................. 40

*Antonelli v. New Jersey*,
419 F.3d 267 (3d Cir. 2005) ......................................... 32, 57

*Atkins v. Westchester Cty. Dep't of Soc. Servs.*
31 F. App'x 52 (2d Cir. 2002) ............................................ 45

*Boston Parent Coal. for Academic Excellence Corp. v. Sch.
Comm. of City of Boston*,
996 F.3d 37 (1st Cir. 2021) ................................................. 58

*Chabad Lubavitch of Litchfield Cty., Inc. v. Litchfield
Historic Dist. Comm'n*,
768 F.3d 183 (2d Cir. 2014) ............................................... 40

*Chin v. Port Auth. of N.Y. & N.J.*,
685 F.3d 135 (2d Cir. 2012) ............................................... 54

*Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio*,
364 F. Supp. 3d 253 (S.D.N.Y. 2019) ...................... 4, 7, 8, 15

*Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio*,
788 F. App'x 85 (2d Cir. 2019) ...................................... 4, 15

*Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of
Pomona, N.Y.*,
945 F.3d 83 (2d Cir. 2019) ...................................... 29, 40, 51

*Doe v. Lower Merion Sch. Dist.*,
665 F.3d 524 (3d Cir. 2011) ........................................ 29, 40

*El-Nahal v. Yassky*,
835 F.3d 248 (2d Cir. 2016) ............................................... 31

iii

# TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*Greater Birmingham Ministries v. Sec'y of Ala.*,
  992 F.3d 1299 (11th Cir. 2021) ......................................................... 40

*Guardians Ass'n of N.Y. City Police Dep't, Inc. v. Civ. Serv. Comm.*,
  630 F.2d 79 (2d Cir. 1980) ................................................................. 32

*Hayden v. Cty. of Nassau*,
  180 F.3d 42 (2d Cir. 1999) ........................................................ *passim*

*Hollander v. Am. Cynamid Co.*,
  172 F.3d 192 (2d Cir. 1999) ............................................................. 57

*Jana-Rock Constr., Inc. v. N.Y. State Dep't of Econ. Dev.*,
  438 F.3d 195 (2d Cir. 2006) ........................................................ 29, 40

*Lewis v. Ascension Parish Sch. Bd.*,
  806 F.3d 344 (5th Cir. 2015)................................................... 30, 40, 43

*N.C. State Conference of the NAACP v. McCrory*,
  831 F.3d 204 (4th Cir. 2016)....................................................... 50, 51

*Orange Lake Assocs. v. Kirkpatrick*,
  21 F.3d 1214 (2d Cir. 1994) ............................................. 30, 35, 36, 40

*Palmer v. Thompson*,
  403 U.S. 217 (1971)................................................................ 30, 42, 43

*Patterson v. Cty. of Oneida*,
  375 F.3d 206 (2d Cir. 2004) ............................................................. 32

*Pyke v. Cuomo*,
  567 F.3d 74 (2d Cir. 2009) .............................................................. 40

*Shaw v. Reno*,
  509 U.S. 630 (1993).......................................................................... 28

# TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*Smith v. Xerox Corp.*,
  196 F.3d 358 (2d Cir. 1999) ........................................................... 56, 57

*Tassy v. Buttigieg*,
  51 F.4th 521 (2d Cir. 2022) ................................................................. 24

*Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*,
  429 U.S. 252 (1977) ..................................................................... *passim*

*Washington v. Davis*,
  426 U.S. 229 (1976) ..................................................................... *passim*

*Watson v. Ft. Worth Bank & Trust*,
  487 U.S. 977 (1988) ........................................................................... 32

*Wright v. Ernst & Young LLP*,
  152 F.3d 169 (2d Cir. 1998) .............................................................. 53

*Yick Wo v. Hopkins*,
  118 U.S. 356 (1886) ........................................................................... 29

**Statutes**

1971 N.Y. Laws ch. 1212 ...................................................................... 5

N.Y. Educ. Law § 2590-g(12) (1996) ............................................... 5, 6, 7

N.Y. Educ. Law § 2590-h(1) ................................................................. 5

**Other Authorities**

U.S. Const. amend. XIV, § 1 ................................................................ 28

Al Baker, *Status Quo at Elite New York Schools: Few Blacks
  and Hispanics*, N.Y. Times, March 11, 2014 ........................................ 8

Kate Taylor, *Legislators Seek to Promote Diversity at Elite
  Public High Schools*, N.Y. Times, March 9, 2016 ................................. 8

# PRELIMINARY STATEMENT

In 2018, faced with a growing lack of racial, geographic, and socioeconomic diversity at eight highly selective specialized high schools ("SHSs"), the New York City Department of Education ("DOE") revised its admissions policy to give a wider and more diverse pool of the City's best students a shot at attending an SHS. The new policy made two changes to the "Discovery Program"—a pre-existing path to SHS admission for high-performing disadvantaged students who would not be admitted based on their test scores alone. DOE expanded the number of SHS seats available through the program and added a new admissions criterion for the program, known as the "Economic Need Index" or "ENI," that focuses on the economic needs of the student's community as a whole.

Plaintiffs brought this suit against New York City's Mayor and DOE's Chancellor (collectively, "the City"), claiming that the new admissions policy violated the Equal Protection Clause because it discriminated against Asian-American applicants to the SHSs. In 2019, the district court denied plaintiffs' motion for a preliminary injunction, and this Court affirmed on interlocutory appeal. After discovery

revealed that DOE's new admissions policy actually *benefited* Asian-American students, the U.S. District Court for the Southern District of New York (Ramos, J.) granted the City's summary judgment motion and dismissed the complaint. This Court should affirm.

The district court correctly concluded that, because DOE's changes to the Discovery Program were undisputedly facially neutral and evenhandedly applied, plaintiffs could prevail on their equal protection claim only by showing that the policy both had a discriminatory effect on Asian-American students and was motivated by discriminatory intent. And the court did not have to reach the issue of intent because, by any metric, the new admissions policy indisputably had no overall discriminatory effect on Asian-American applicants to the SHSs. After the new policy went into effect, Asian-Americans continued to be the most successful group of SHS applicants, as compared to Black, Latino, and white applicants. Not only that, but according to plaintiffs' own expert's analysis, the changes to the Discovery Program actually increased the representation of Asian-American students in the SHSs as a whole. Faced with such a clear lack of discriminatory effect, the district court properly granted the City summary judgment.

Plaintiffs' contrary arguments amount to a disingenuous effort to bend binding equal protection precedent in their favor, after SHS admissions data undermined their original theory of the case. Faced with undisputed evidence that the changes to the Discovery Program benefited Asian-American applicants, plaintiffs reverse course and argue that they can prevail merely by showing "unequal treatment," even if that facially race-neutral treatment did not actually have a discriminatory effect on Asian Americans. That is decidedly not the law. This Court has made clear that proof of discriminatory effect is required to prevail on an equal protection claim that challenges a facially neutral and evenhandedly applied hiring or admissions policy, like this one.

As a last attempt to salvage their claim, plaintiffs purport to divine discriminatory effect from supposed (and tiny) decreases in Asian-American representation at two of the eight SHSs. But their expert's analysis does not raise a material issue of fact because it cannot be squared with their allegations of citywide discriminatory effect and, in any event, is deficient as a matter of law: plaintiffs' expert did not identify the correct population for analysis and his method of measuring discriminatory effect has not been adopted by other courts.

3

## ISSUE PRESENTED FOR REVIEW

Did the district court properly grant the City summary judgment on plaintiffs' equal protection claim challenging DOE's changes to the admissions process for the Discovery Program at the City's specialized high schools?

## STATEMENT OF THE CASE

### A. DOE's facially neutral changes to the Discovery Program

#### 1. New York City's specialized high schools and their admissions process

Since the early 20th century, New York City has operated a small number of specialized high schools. These schools provide rigorous instruction to academically gifted students in a challenging environment and are considered to be among the finest public high schools in the country. *See Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio*, 364 F. Supp. 3d 253, 264 (S.D.N.Y. 2019), *aff'd*, 788 F. App'x 85 (2d Cir. 2019). DOE currently operates eight SHSs: Bronx High School of Science, Brooklyn Technical High School, the High School for Mathematics, Science, and Engineering at City College, the High School of American Studies at Lehman College, Queens High School for the Sciences at York College, Staten Island Technical High

4

School, Stuyvesant High School, and the Brooklyn Latin School (Joint Appendix ("A") 127).[1]

For background, in the 1930s, the SHSs began making admissions decisions based on student performance on a standardized entrance exam called the Specialized High School Admissions Test ("SHSAT") (S.D.N.Y. Dkt. 50 at 3). By the late 1960s, the SHSs were also granting admission via an alternative path: a "Discovery Program that extended offers of admission to disadvantaged students who showed potential for success at the [SHSs]" (*id.*). This two-part admissions structure was formalized in 1971 when the State Legislature passed the Hecht-Calandra Act. *See* 1971 N.Y. Laws ch. 1212. That enactment codified the entrance exam and the Discovery Program as the only methods of admission to the SHSs. *See* N.Y. Educ. Law §§ 2590-h(1)(b), 2590-g(12) (1996).

Under the first admissions option, students are offered a seat at an SHS if they have "successfully achieved a score above the cut-off

---

[1] DOE also operates a ninth SHS: Fiorello H. LaGuardia High School of Music & Art and Performing Arts (A23). Admission to LaGuardia is "based on audition and the review of a student's portfolio and academic records," so it is not at issue in this case (A24).

score for the openings in the school for which [they have] taken the examination." N.Y. Educ. Law § 2590-g(12)(b) (1996). When they sit for the SHSAT, students are instructed to list the SHSs that they would like to apply to in order of preference (A86). DOE compiles the test scores and rank-orders them from highest to lowest (*id.*). The student with the highest score is placed in his or her first-choice school (*id.*). Subsequent students, in order of score, are placed in their first-choice schools as long as there are available seats (*id.*). As schools fill up, students are placed in their highest-ranked school in which a seat is available (A86-87). That process continues until all seats have been filled (A87). The SHSAT score of the last student offered admission to a school is the cutoff score. N.Y. Educ. Law § 2590-g(12)(b) (1996).

Under the second option, students who take the SHSAT may also be eligible for admission via the Discovery Program, which is designed "to give disadvantaged students of demonstrated high potential an opportunity to try the special high school program." N.Y. Educ. Law § 2590-g(12)(d) (1996). State law provides that a student qualifies for the Discovery Program if they score below the cutoff score, are "disadvantaged," are recommended by their middle school as having

high potential for the SHSs, and attend a summer preparatory program to demonstrate their ability to succeed at an SHS. *Id*. The state statute does not define the term "disadvantaged," leaving that determination to DOE's discretion. *Id*.; *see also Christa McAuliffe*, 364 F. Supp. 3d at 265.

Prior to the 2019-20 school year, DOE treated a student as disadvantaged if any one of the following four criteria applied: (1) the student qualified for free or reduced-price lunch, (2) the student received financial assistance from the City, (3) the student was a foster child, a ward of the state, or living in temporary housing, or (4) the student had entered the United States within the past four years and lived in a home where the primary language is not English (A65).

### 2. The specialized high schools' persistent and growing lack of racial, geographic, and socioeconomic diversity

Despite the City's longstanding use of the Discovery Program as a path to admission for disadvantaged students, it is undisputed that the SHSs have become less diverse over the past several decades—racially, geographically, and socioeconomically.

Most of the City's middle schools send no students to the SHSs at all (S.D.N.Y. Dkt. 50 at 8, 12). Very few students come from middle

schools in the Bronx, and the combined percentage of Black and Latino students enrolled in the SHSs continues to decline (*see id.*). Indeed, the lack of racial and ethnic diversity had become so pronounced by the 2017-18 school year that, of the students at Stuyvesant, only 0.7% were Black and 2.8% were Latino; of those at Bronx Science only 2.5% were Black and 6.2% were Latino; and of those at Staten Island Tech only 0.8% were Black and 2.7% were Latino (*id.*). In contrast, Black and Latino students make up 66% of New York City's overall student population. *Christa McAuliffe*, 364 F. Supp. 3d at 266.

In past years, this lack of diversity received substantial media attention.[2] And it is undisputed that DOE has implemented other strategies designed to increase diversity: opening more SHSs, expanding test prep opportunities, improving student outreach, training teachers on SHSAT prep, and offering students greater SHSAT scheduling flexibility (S.D.N.Y. Dkt. 50 at 4-7). Despite those efforts, by 2017, just 30 out of the City's roughly 650 middle schools accounted for

---

[2] *See, e.g.*, Al Baker, *Status Quo at Elite New York Schools: Few Blacks and Hispanics*, N.Y. TIMES, March 11, 2014, https://perma.cc/55AK-YQWP; Kate Taylor, *Legislators Seek to Promote Diversity at Elite Public High Schools*, N.Y. TIMES, March 9, 2016, https://perma.cc/JQ7X-25NX.

half of the students admitted to the SHSs (*id.* at 8). And the combined percentage of Black and Latino students continued to decline (*id.*).

### 3. DOE's changes to the Discovery Program for specialized high school admissions

In June 2018, DOE announced changes to the Discovery Program designed to increase ethnic, racial, geographic, and socioeconomic diversity at the SHSs (A76, 160-63). Under those race-neutral changes, the Discovery Program expanded from roughly 5% to 13% of the total SHS seats for the class entering in the 2019-20 school year, and rose to 20% the following school year (A91, 160-61). The criteria to participate in the Discovery Program also changed. Now, in addition to scoring just below the cutoff for admissions based on SHSAT score alone, and demonstrating individual disadvantage, students also had to attend a school with an Economic Need Index ("ENI") of 0.60 or higher to qualify for the program (A65, 161).

The ENI metric itself was not new. Originally created by DOE in 2012, ENI is "used to measure economic disadvantage" (A44). It "provides an estimate of the percentage of students … facing economic hardship" in a given school (A45). A school's ENI is determined by

averaging the Economic Need Values ("ENV") of all the students attending the school (*id.*). A student's ENV is 1.0 if they (1) are eligible for public assistance; (2) have recently lived in temporary housing; or (3) have a home language other than English and recently enrolled in a DOE school (*id.*). The ENV for all other students in the school is equal to the percentage of families with school-age children in the student's census tract whose income is below the poverty line (A46). So, for example, if a 10-student school has two students with an ENV of 1.0 and the other students reside in a census tract where 50% of families with school-age children are below the poverty line, the ENI for the school is 0.60.[3] DOE has found that the ENI is "a more effective measure of economic disadvantage in many contexts than other measures of poverty" (A44-45).

The 0.60 ENI threshold was selected based on studies performed by DOE's Office of Student Enrollment in April 2018 (A82-83). It allowed DOE to "more precisely target schools where the majority of students are facing economic hardship and the disadvantages that

---

[3] This number is calculated by adding up the ENVs for all 10 students (1.0 + 1.0 + (0.5 x 8) = 6), and then dividing 6 by 10 to determine the average ENV: 0.60.

accompany it" (S.D.N.Y. Dkt. 50 at 12). And, according to "extensive social science research, … students attending high-poverty schools are more disadvantaged and face more academic challenges than similarly-situated students attending lower-poverty schools" (A45). Further, a substantial percentage of the then-approximately 465 New York City middle schools with an ENI of 0.60 or higher had not sent any students to the SHSs in recent years (S.D.N.Y. Dkt. 50 at 12). The 0.60 ENI threshold was thus designed to identify and target those disadvantaged student populations that were historically excluded from the SHS admissions process (*id.*).

In practice, identifying Discovery Program-eligible candidates works as follows: Once DOE determines the cutoff score for admission based solely on SHSAT, it compiles a list of all applicants who scored below the cutoff, eliminates those who attend a middle school with an ENI below 0.60, and creates an "estimated score range" for the Discovery Program that "encompass[es] far more than enough students, taken in rank order, who may be eligible for and interested in" the Discovery Program (A87). DOE then sends letters to that potential

applicant pool, informing them that they "may be eligible" for the Discovery Program and inviting them to apply (A89).

Thus, many of the students on that invitation list do not in fact qualify for the Discovery Program, and others never apply for it (A89). And in fact, DOE often lacks information about whether the student is individually disadvantaged (*i.e.* whether the student qualifies for free or reduced-price lunch or receives financial assistance from the City, for example) (*id.*). For those students, DOE asks them to submit documentation proving that they are individually disadvantaged (*id.*). Based on the information students provide about whether they are interested and eligible for the Discovery Program, DOE "prepare[s] a list of students to whom offers can be made" and only then makes offers to those students based on their "scores on the SHSAT and their school choices" (*id.*).

### B. Plaintiffs' equal protection challenge to DOE's facially neutral and evenhandedly applied policy

#### 1. Plaintiffs' complaint, alleging discriminatory intent and a discriminatory effect on Asian-American applicants to the SHSs

In December 2018, plaintiffs filed this lawsuit in the Southern District, alleging that the Discovery Program changes violated the Fourteenth Amendment's Equal Protection Clause by discriminating against Asian-American applicants to the SHSs (A5-22).

In their complaint, plaintiffs conceded that "the Discovery changes are facially race-neutral" (A18), and did not allege that they were applied or enforced by DOE in a racially discriminatory manner (*see* A5-22). Instead, plaintiffs alleged that the revised Discovery Program admissions policy violated the Equal Protection Clause because it supposedly "disproportionately impact[ed] Asian Americans" across all eight SHSs, and was also purportedly motivated by a discriminatory purpose (A16-19; *see also* A20 (recognizing that "[t]he Supreme Court has held that facially neutral state action violates the Equal Protection Clause when it has a disparate impact upon a particular racial group and was enacted with a racially discriminatory purpose")).

This theory of liability permeates the complaint. For example, plaintiffs alleged that the new admissions policy "disproportionately prohibit[ed] Asian-American students from competing for 20 percent of the seats at each Specialized High School" and "disproportionately harm[ed] Asian-American students by decreasing the number of students who can gain admission without Discovery" (A6; *see also* A21 (predicting that DOE's policy change would "reduce the number of Asian Americans who enroll in the Specialized High Schools")). Plaintiffs also pointed to public statements by then-Mayor Bill de Blasio and then-Chancellor Richard A. Carranza that they claimed were evidence of "racial intent" (A18-19).

Moreover, plaintiffs repeated this same effects-plus-intent theory of equal protection liability in their preliminary injunction motion, which sought to prohibit defendants from enforcing the "challenged policy to expand and reorganize the Discovery Program for admission into New York City's Specialized High Schools" (S.D.N.Y. Dkt. 10). Consistent with the allegations in their complaint, plaintiffs argued that they were likely to succeed on the merits of their equal protection claim because they "ha[d] established disparate impact and

discriminatory intent" (S.D.N.Y. Dkt. 11 at 18; *see also id.* at 1 ("Under the Equal Protection Clause, this racial motivation and discriminatory effect shifts the burden to Defendants to prove that the policy satisfies strict scrutiny"); *id.* at 6 ("the ENI restriction makes it certain that Defendants' Discovery reorganization will disproportionately affect Asian Americans")).

Analyzing the equal protection claim just as plaintiffs framed it, the district court denied the preliminary injunction motion. *Christa McAuliffe*, 364 F. Supp. 3d at 261. The court held that plaintiffs were not likely to succeed on the merits of their claim because (1) there was no evidence of discriminatory intent, and (2) the Discovery Program changes satisfied rational basis review because they were "rationally related to a legitimate government interest in helping more economically disadvantaged students receive a high-quality education." *Id.* at 277-80. A panel of this Court affirmed, but on standing grounds. *Christa McAuliffe*, 788 F. App'x at 85-86. Plaintiffs subsequently cured the standing defects identified by this Court, and the City no longer disputes that plaintiffs have standing (S.D.N.Y. Dkt. 133).

## 2. The evidence that DOE's policy changes had no discriminatory effect on Asian-American students and, if anything, benefited them

Following the denial of plaintiffs' preliminary injunction motion, the district court bifurcated discovery (A39). The court directed that the first phase would "address the impacts caused by or arising out of the changes made to" the program (*id.*). Only if plaintiffs "establish[ed] a disparate impact" or discriminatory effect "caused by the changes" to the program would discovery proceed to the second phase: namely, defendants' motivations for adopting the changes (*id.*).

The first phase of discovery gutted plaintiffs' theory of the case by indisputably producing no evidence that DOE's changes to the Discovery Program had an overall discriminatory effect on Asian-American admissions to the SHSs. To the contrary, the evidence revealed that the new admissions policy actually benefited Asian-American applicants during the 2019-20 and 2020-21 admissions cycles.

SHS admissions data revealed that from 2006 to 2018, Asian-American students consistently "received the largest percentage of offers" to the SHSs, "received far more offers than they would have under the predicted result model" where all racial groups (Asian, Black,

Latino, and white) perform equally well, and had "the highest passing rate … of the four major racial/ethnic groups" (A67, 71). That trend of Asian-American overachievement continued uninterrupted in 2019-20 and 2020-21, after the Discovery Program changes were implemented (*id.*).

For example, in the 2018 admissions cycle—the last year before the Discovery Program changes—Asian-American students made up 31.1% of the SHS applicant pool and received 52.2% of the offers for admission (A72, 77). Those numbers remained essentially unchanged in 2019 and 2020. Asian-Americans were 30.7% of the applicant pool in 2019 and received 52.4% of the offers (*id.*). And they were 31.4% of the applicant pool in 2020 and received 54.8% of the offers (*id.*).

The comparative offer rate data[4] for the four major racial groups revealed similar trends. In 2018, the Asian-American offer rate was 31.7%, the rate for Black students was 4.1%, the rate for Latino students was 5.5%, and the rate for white students was 26.7% (A78). In

---

[4] In the district court, this data was referred to as the "passing rate" (*see, e.g.*, A77-78). We adopt the term "offer rate," as it includes admissions offers based on both SHSAT scores and the Discovery Program.

2019, the Asian-American offer rate was 33.2%, the rate for Black students was 4.4%, the rate for Latino students was 6.1%, and the rate for white students was 28.2% (*id.*). Finally, in 2020, the Asian-American offer rate was 31.9%, the rate for Black students was 5.4%, the rate for Latino students was 6.4%, and the rate for white students was 23.7% (*id.*).

Indeed, plaintiffs' own expert, Dr. Jacob L. Vigdor, conceded that the Discovery Program changes had, in practice, benefited Asian-American applicants to the SHSs. Dr. Vigdor analyzed DOE data on SHS admissions and "performed three consecutive simulations under alternate sets of admission policies" to determine what the "profile of admitted students" would look like if DOE had not made changes to the Discovery Program (A177-78). Under all three simulations, Asian-American students received fewer offers of admission to the SHSs than they did in reality, after the Discovery Program changes were implemented (A178-79). In other words, Dr. Vigdor admitted, the effect of those changes "was to slightly *increase* the representation of Asian students in the specialized high schools as a whole" (A166 (emphasis added)).

18

Perhaps dissatisfied with these results, Dr. Vigdor also performed the same three simulations for each individual SHS (A179). But even those cherry-picked results showed increases, or at most negligible decreases, in Asian American offer rates. For most of the SHSs—six of the eight—the results were the same: the Discovery Program changes "resulted in a higher representation of Asian students" (A182). For the other two, Dr. Vigdor's analysis showed slight decreases in the proportion of Asian-American students receiving offers as compared to a simulated world where DOE had not made the challenged Discovery Program changes: at Stuyvesant, the proportion declined by just 0.7%, while at Bronx Science, by only 1.4% (A179-80).

Reviewing that analysis, however, the City's expert—Michael Scuello—identified a significant error. Dr. Vigdor had calculated the Asian-American offer rate at each SHS using the wrong population: he looked to the number of students who received an *invitation to apply* to the Discovery Program, rather than the number of students who received an *offer to attend* the program (A212). Scuello explained that invitation data did not capture the relevant population of Asian-American offerees since, as explained above, "some 'invitations' to the

19

Discovery program are extended to students who are not, in fact, eligible for the program—because even though the student attends a school with a high ENI, their families are not individually disadvantaged" (*id.*). Using the data field that represents actual offers to attend the Discovery Program (titled "Approved to Participate in Discovery"), rather than the overbroad "Invitation to Discovery" data field, Scuello determined that between 2018 and 2020, "the percentage of seats offered to Asian students" at the SHSs "increased both overall and at each of the eight [SHSs]" individually (A212-15).

### 3. The district court's grant of summary judgment to the City

Based on this clear data refuting plaintiffs' theory that the revised policy had negatively impacted Asian-American students' admission to the SHSs, the City moved for summary judgment (A42-43). The district court granted the motion and held that the plaintiffs could not prevail on their equal protection claim "because the challenged policies have not had a discriminatory effect" on Asian-American students (Special Appendix ("SPA") 10).

The court began by observing that this Court and the Supreme Court have identified three ways that the government can discriminate on the basis of race in violation of the Equal Protection Clause: (1) where a law or policy "expressly classifies individuals by race," (2) where the government "enforces a facially neutral statute in a racially discriminatory way," or (3) where the application of a facially-neutral and evenhandedly applied law or policy "results in a discriminatory effect, and … is motivated by a discriminatory purpose" (SPA10-11). And here, because "the challenged reforms to the Program are facially neutral" and were not "administered in a racially discriminatory way," the court concluded that plaintiffs were obliged to prove "both discriminatory purpose *and* discriminatory effect" (SPA11 (emphasis in original)).

Next, the district court noted that, to determine whether a policy has produced a racially discriminatory effect, courts evaluate whether it disproportionately affects the protected group "in the aggregate" (SPA13). The court rejected plaintiffs' argument that all they had to show was what they termed "unequal treatment," rather than discriminatory effect (SPA14-17), noting that plaintiffs failed to identify

21

"any case in which a court has deemed proof of disparate impact unnecessary to support an equal protection claim against a facially neutral policy enforced in a non-discriminatory manner" (SPA15-16). Nor had plaintiffs identified any case holding "that discriminatory impact can be proved by showing 'unequal treatment' when the policy has not resulted in disproportionate harm to a particular group" (SPA16).

In any event, the district court concluded, DOE's changes to the Discovery Program do not amount to "unequal treatment" because, on their face, they "do not treat students differently on the basis of race" (SPA16). Instead, the ENI requirement "is a measure of economic disadvantage—not of a school's racial composition" (SPA17).

The district court thus concluded that DOE's changes to the Discovery Program "have not resulted in a discriminatory effect" upon Asian-American students (SPA18). The court endorsed the City's "well-established" and "routinely adopted" methods of analyzing discriminatory effect—comparing the racial composition of the offer pool to the applicant pool and comparing the offer rate of each racial group—and concluded that under both methods, there was "no evidence of

22

disparate impact" (SPA18-20). And even under plaintiffs' preferred method—a disfavored approach that compared Asian-American students' "performance before and after the contested reforms to the Program"—plaintiffs "still would not prevail" (SPA20). Compared to 2018, the court noted, both in 2019 and 2020, "the percentage of offers" received by Asian-American students increased, "the offer-rate" among Asian-Americans increased, and "the spread" between Asian-American students' "share of offers and share of test-takers increased" (*id.* (emphasis omitted)).

Finally, the district court rejected plaintiffs' argument that their expert's analysis of Asian-American offer rates at Stuyvesant and Bronx Science raised triable issues of fact (SPA22). First, the court observed that plaintiffs' expert had improperly based his conclusion on inapposite "invitation-to-the-Discovery-Program data rather than the approved-offer-to-the-Discovery-Program data" (*id.*; *see also* SPA6 n.8). In any event, the court concluded that the "minor differences" in offer rates at those two schools were not "significant" enough to establish discriminatory effect (*id.*). And further, statistical evidence of offer rates

at only two of the eight SHSs could not help plaintiffs, because their equal protection claim alleged discrimination across all eight SHSs (*id.*).

## STANDARD OF REVIEW
## AND SUMMARY OF ARGUMENT

The district court correctly granted summary judgment to the City and dismissed the complaint. Reviewing that decision de novo, *Tassy v. Buttigieg*, 51 F.4th 521, 528-29 (2d Cir. 2022), this Court should affirm.

First, the district court properly applied this Court's decision in *Hayden v. County of Nassau*, 180 F.3d 42 (2d Cir. 1999), and concluded that because DOE's changes to the Discovery Program were facially neutral and evenhandedly applied, plaintiffs could prevail on their equal protection claim only by establishing both discriminatory effect and discriminatory intent.

Second, the district court properly concluded that plaintiffs presented no evidence that raised a triable issue of fact about discriminatory effect. Instead, DOE's SHS admissions data revealed that Asian-American applicants continued to far out-perform Black, Latino, and white applicants after the Discovery Program changes were implemented, and actually benefited from the changes. Asian-American students continued to receive the largest percentage of offers, continued

24

to receive far more offers than they would have under a predicted results model where all racial groups perform equally well, and continued to have the highest offer rate of the four major racial groups.

Finally, the district court properly rejected plaintiffs' attempts to avoid the clear import of this evidence. The court correctly declined plaintiffs' invitation to rewrite binding equal protection precedent and relieve them of their obligation to prove discriminatory effect. This Court and other federal courts of appeal have repeatedly held that, where a government policy is facially neutral and evenhandedly applied, a plaintiff *must* prove discriminatory effect. The Supreme Court decisions plaintiffs cite do not hold otherwise, notwithstanding plaintiffs' selective quotations.

Instead of discriminatory effect, plaintiffs propose that the relevant inquiry should be whether Asian Americans were subjected to "unequal treatment based on race." But plaintiffs cite no case law supporting that argument, and "unequal treatment"—to the extent plaintiffs mean this term to describe something that produces no discriminatory effect—does not support an equal protection claim against a facially neutral and evenhandedly applied policy. And here,

25

there is no evidence linking the "unequal treatment" plaintiffs complain of—the use of an economic need criterion that excludes some middle schools from the Discovery Program—to a discriminatory effect on Asian-American admissions to the SHSs. Instead, it is undisputed that Asian-American representation at the SHSs *increased* after DOE's changes to the Discovery Program.

As a last resort, plaintiffs try to prove up discriminatory effect through their expert's analysis showing minor reductions in Asian-American offer rates at two of the eight SHSs. The district court, however, properly rejected that argument because it is decidedly mismatched with what plaintiffs' complaint alleges and what their theory of liability was at the preliminary injunction phase: discriminatory effect across all SHSs. In any event, the district court also correctly noted that plaintiffs' expert had analyzed the wrong population: students invited to apply for the Discovery Program rather than students who received an offer to attend the program. Using the correct data field—the one that identified actual Asian-American offerees to the Discovery Program—the City's expert confirmed that "the percentage of seats offered to Asian students at the [SHSs]

increased both overall and at each of the eight" schools individually (A212 (emphasis omitted)). That should be the end of the inquiry.

## ARGUMENT

### THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT TO THE CITY

The district court properly required plaintiffs to establish discriminatory effect on Asian-American applicants to the SHSs to prevail on their equal protection challenge to the City's new Discovery Program admissions policy. And, as the court recognized, plaintiffs failed to raise a triable issue of fact about discriminatory effect because the challenged changes to the Discovery Program benefitted Asian Americans. The district court also rightly rejected plaintiffs' attempt to salvage their case by asserting that they could make out an equal protection violation without evidence of a discriminatory effect, and by proffering erroneous expert analysis of offer rates at two SHSs that does not raise a triable issue of fact about discriminatory effect.

**A. Since plaintiffs sought to upend a facially neutral and evenly applied policy on equal protection grounds, they were obliged to show that the policy has a discriminatory effect.**

The Fourteenth Amendment declares that "no State shall … deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Equal Protection Clause's "central purpose is to prevent the States from purposefully discriminating between individuals on the basis of race." *Shaw v. Reno*, 509 U.S. 630, 642 (1993).

This Court has long identified three types of laws or policies triggering strict scrutiny review under the Equal Protection Clause. *Hayden*, 180 F.3d at 48 (citing *Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 264-65 (1977)). The first type are discriminatory on their face, in that they "expressly classif[y] persons on the basis of race." *Id*. The second are facially neutral but "applied in a discriminatory fashion." *Id*. The third are also facially neutral and, though not applied in a race-conscious way, were "motivated by discriminatory animus and [their] application results in a

discriminatory effect." *Id.*; *accord Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona, N.Y.*, 945 F.3d 83, 111 (2d Cir. 2019).[5]

Here, the first two categories undisputedly do not apply. At the outset, plaintiffs correctly concede that the first is inapplicable because DOE's changes to the Discovery Program do not take account of any student's race and are thus "facially race-neutral" (Brief for Appellant ("App. Br.") 14, 42; *see also* A18). The mere fact that race was considered when designing a facially neutral policy does not itself amount to a racial classification. *Hayden*, 180 F.3d at 48; *accord Doe v. Lower Merion Sch. Dist.*, 665 F.3d 524, 548 (3d Cir. 2011). Nor does the policy fall into the second category. Plaintiffs do not allege that the Discovery Program changes are enforced or applied in a discriminatory manner (*see* A5-22). Rather, the same SHS admissions criteria are applied equally to all prospective students, regardless of race. *See Yick Wo v. Hopkins*, 118 U.S. 356, 373-74 (1886); *Doe*, 665 F.3d at 549.

---

[5] If the challenged governmental action does not fall into one of these three categories, it is subject to rational basis review. *See Jana-Rock Constr., Inc. v. N.Y. State Dep't of Econ. Dev.*, 438 F.3d 195, 212 (2d Cir. 2006). Plaintiffs have never disputed that DOE's Discovery Program changes would survive this exceedingly deferential form of scrutiny.

Thus, plaintiffs are left to argue—and were obliged to adduce proof—that the Discovery Program changes were motivated by discriminatory intent *and* will have a discriminatory effect on Asian-American students. *See Arlington Heights*, 429 U.S. at 264-65; *Hayden*, 180 F.3d at 48. For this third category, discriminatory intent alone, without an adverse effect, is insufficient to establish an equal protection claim. *See Palmer v. Thompson*, 403 U.S. 217, 224 (1971) ("no case in this Court has held that a legislative act may violate equal protection solely because of the motivations of the men who voted for it"); *Lewis v. Ascension Parish Sch. Bd.*, 806 F.3d 344, 358-59 (5th Cir. 2015) (declining to reach intent question where no discriminatory effect found); *Orange Lake Assocs. v. Kirkpatrick*, 21 F.3d 1214, 1226 (2d Cir. 1994) ("[T]he test for determining whether to apply strict scrutiny to a facially-neutral, even-handedly applied law is not solely a test for determining disparate impact and not solely a test of legislative motive."). Likewise, an adverse effect without discriminatory intent will not suffice. *Orange Lake Assoc.*, 21 F.3d at 1226; *see Arlington Heights*, 429 U.S. at 264-65; *Washington v. Davis*, 426 U.S. 229, 242 (1976).

Plaintiffs' claim has always been premised on this third theory (*see, e.g.*, A6, 16-21, S.D.N.Y. Dkt. 11 at 18). The district court thus properly applied those equal protection principles here and concluded that, to survive summary judgment, plaintiffs had to show that the Discovery Program reforms resulted in a discriminatory effect (SPA18). Only then would it be necessary to move to the next phase of discovery, geared towards ascertaining whether the policy was motivated by a discriminatory intent.

**B. The district court correctly concluded that, as a matter of law, DOE's changes to the Discovery Program had no discriminatory effect on Asian-American admissions.**

Having correctly identified the controlling legal framework, the district court reviewed the evidence and properly concluded that summary judgment was warranted because the Discovery Program changes simply "have not resulted in a discriminatory effect upon Asian American students" (SPA18). *See El-Nahal v. Yassky*, 835 F.3d 248, 252 (2d Cir. 2016) (summary judgment warranted where "nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof" (cleaned up)).

To determine whether a government hiring or admissions policy has an overall discriminatory effect, courts typically compare the applicant pool and offer-pool data. *See Watson v. Ft. Worth Bank & Trust*, 487 U.S. 977, 995 (1988) (explaining that, to prove disparate racial impact, plaintiffs must produce evidence that one race is disqualified from selection "at a substantially higher rate" than other races); *Guardians Ass'n of N.Y. City Police Dep't, Inc. v. Civ. Serv. Comm.*, 630 F.2d 79, 86-88 (2d Cir. 1980) (comparing "the racial composition of the passing group to that of the applicant group" to evaluate a prima facie case of discrimination under Title VII[6]; *see also Antonelli v. New Jersey*, 419 F.3d 267, 276 (3d Cir. 2005) (analyzing discriminatory effect prong of equal protection claim by comparing the passing rates of the relevant racial groups).

For example, in *Hayden*, this Court considered whether Nassau County's race-neutral changes to its entrance exam for police officers—

---

[6] Although *Watson* and *Guardians* involve racial discrimination claims under Title VII, their analysis of discriminatory effect applies to equal protection claims as well. *See, e.g., Patterson v. Cty. of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004) ("Most of the core substantive standards that apply to claims of discriminatory conduct in violation of Title VII are also applicable to claims of discrimination in violation of … the Equal Protection Clause.").

which were designed to reduce the discriminatory impact of the test on Black candidates—violated the Equal Protection Clause. 180 F.3d at 46-48. The Court concluded that the changes had "no discriminatory impact" on white and Latino candidates because those candidates "score[d] higher than black candidates, *on average*," even though the redesigned exam also "decreased the adverse impact on black applicants." *Id.* at 52 (emphasis added).

Here, as plaintiffs concede (App. Br. 47 n.35), comparing the SHS applicant pool to the offer pool reveals that the Discovery Program changes have had absolutely no adverse effect on Asian-American students. Far from it: Asian Americans "continue[] to receive the largest percentage of offers, continue[] to receive far more offers than they would have under the predicted result model where all groups do equally well, and continue[] to have the highest passing rate of the four major racial/ethnic groups" (A71).

The data is overwhelming and undeniable. To start, Asian-American applicants have received far more SHS offers than would be expected based on their representation in the applicant pool. In 2019, the first year that the Discovery Program changes were implemented,

Asian-American students accounted for 30.7% of the applicant pool but received 52.4% of the offers to attend an SHS (A72, 77). And in 2020, Asian Americans were 31.4% of the applicant pool but received 54.8% of all offers (*id.*).

The offer rate for Asian-American applicants to the SHSs also continues to far exceed the rates for Black, Latino, and white applicants, even after the new Discovery Program admissions policy went into effect in 2019 (A78). In that year, Asian Americans received 33.2% of all SHS offers, compared to 4.4% for Black applicants, 6.1% for Latino applicants, and 28.2% for white applicants (*id.*). The results were similar in 2020: Asian Americans received 31.9% of all SHS offers, compared to 5.4% for Black applicants, 6.4% for Latino applicants, and 23.7% for white applicants (*id.*). As the district court correctly held, those statistics reveal "no evidence of disparate impact" on Asian-American SHS applicants (SPA19-20).

What's more, the district court correctly noted that even under plaintiffs' preferred method for evaluating discriminatory effect—comparing the performance of Asian Americans "before and after the contested reforms" to the Discovery Program—plaintiffs' proof still fell

34

short (SPA20). Put simply, Asian-American students "have fared better after the reforms than before them" (*id.* (emphasis omitted)). As compared to 2018, in 2019 and 2020, "the percentage of offers" received by Asian-American students increased, "the offer-rate" among Asian Americans increased, and "the spread" between Asian-American students' "share of offers and share of test-takers increased" (*id.* (emphasis omitted)). Indeed, plaintiffs' own expert concluded that the effect of DOE's changes to the Discovery Program "was to slightly *increase* the representation of Asian students in the specialized high schools as a whole" (A166 (emphasis added)).

Thus, the district court properly concluded that "the changes to Discovery … have not resulted in a discriminatory effect on Asian Americans" (SPA21). And because DOE's Discovery Program admissions policy is facially neutral and evenhandedly applied, that lack of discriminatory effect dooms plaintiffs' equal protection claim. *See Hayden*, 180 F.3d at 50-52 (no valid equal protection claim where plaintiffs "suffered no discriminatory impact in the administration or scoring of the facially neutral examination"); *Orange Lake Assocs.*, 21

F.3d at 1226-27 (no equal protection violation where zoning amendments did not have disparate impact on minority groups).

### C. Plaintiffs' attempts to salvage their case are unavailing.

Now that discovery has revealed that Asian-American students benefited from DOE's changes to the Discovery Program, plaintiffs do not really dispute that, if they are obligated to prove discriminatory effect, the equal protection claim they alleged in their complaint would fail. To get around this problem, plaintiffs adopt a scattershot strategy. They first argue that their claim does not actually require proof of discriminatory effect.[7] But they can only do so by selectively quoting and misconstruing binding equal protection precedent. Plaintiffs next argue that their equal protection claim can instead be based solely on the "unequal treatment" purportedly caused by the facially neutral ENI

---

[7] Although plaintiffs nominally take issue with the district court's holding that they were required to prove "aggregate" discriminatory effect (App. Br. 46-50), their argument is really that they were not required to prove *any* discriminatory effect (*see, e.g.*, *id.* at 38 ("If the available evidence shows a racial purpose, then the policy must be struck down unless it can pass strict scrutiny")). But, to the extent plaintiffs are also asserting that something other than "aggregate" discriminatory effect is enough, it wouldn't matter. As explained below (*see infra* at 52-58), the purported minor reduction in Asian-American representation at two of the eight SHSs does not raise a triable issue of fact about discriminatory effect.

36

criterion. But they make no effort to link that differential treatment to adverse SHS admissions outcomes for Asian-American students.

Equally fruitless is plaintiffs' last ditch effort to locate discriminatory effect in purported small reductions in Asian-American offer rates at two of the eight SHSs. As the district court correctly recognized, that argument is inconsistent with plaintiffs' theory of discriminatory effect across all the SHSs. And, as the court further explained, the claimed reductions are the product of plaintiffs' expert's faulty analysis. The expert looked to the wrong population: students who were invited to apply for the Discovery Program because they might be eligible, rather than students who were actually found eligible and received offers to attend. In reality, Asian-American representation at the two SHSs actually increased after the Discovery Program changes were implemented, just as at the other six schools.

### 1. For this type of equal protection claim, plaintiffs were required to establish discriminatory effect.

The district court properly rebuffed plaintiffs' attempt to escape from the requirement to show a discriminatory effect. From the outset, plaintiffs recognized that this requirement was a fundamental part of

37

their equal protection claim. In their complaint and preliminary injunction briefing, plaintiffs consistently argued that DOE's changes to the Discovery Program violated the Equal Protection Clause because they had a discriminatory effect on Asian-American students applying to the SHSs and were motivated by a discriminatory purpose (*see, e.g.*, A6, 16-21; S.D.N.Y. Dkt. 11 at 1, 13, 18; S.D.N.Y. Dkt. 55 at 10).

For example, plaintiffs alleged that the new Discovery Program admissions policy violated the Equal Protection Clause because its effect would be to "reduce the number of Asian Americans who enroll in the Specialized High Schools" (A21). And in their preliminary injunction papers, plaintiffs argued that they were likely to succeed on the merits of their claim because they "ha[d] established disparate impact and discriminatory intent" (S.D.N.Y. Dkt. 11 at 18) and because "the ENI restriction makes it certain that Defendants' Discovery reorganization will disproportionately affect Asian Americans" applying to the SHSs (S.D.N.Y. Dkt. 11 at 6; *see also* No. 19-550, Dkt. 36 at 28 ("Appellants alleged that the defendants' reorganization of the Discovery program violates their equal protection rights because it has the purpose and

38

effect of reducing Asian-American enrollment at the specialized high schools")).

But, after discovery revealed that the changes to the Discovery Program actually benefited Asian-American applicants to the SHSs (*see supra* at 33-35), plaintiffs changed tack and argued that they were not actually required to prove discriminatory effect after all (App. Br. 42-50). That argument is wrong for several reasons.

To start, plaintiffs argue that the Supreme Court's decisions in *Arlington Heights* and *Davis* do not "invariably" require proof of discriminatory effect "in every [equal protection] case" (App Br. 39, 43, 45). True enough, but that is not what the district court held or what the City argues here. Instead, the district court simply held that in this particular context—where it is undisputed that DOE's policy is facially neutral and evenhandedly applied—plaintiffs were required to establish both discriminatory effect and discriminatory intent (SPA18).

That holding is entirely consistent with this Court's equal protection jurisprudence. As early as 1994, this Court explained that where a law or policy is "facially neutral" and "even-handedly applied," strict scrutiny is only warranted where, in addition to discriminatory

intent, "the law has such a disproportionate impact" on one race "that [the Court] may view the law as if it created such a classification on its face." *Orange Lake Assocs.*, 21 F.3d at 1226. The Court has reaffirmed that well-established rule over and over again for decades. *See, e.g.*, *Hayden*, 180 F.3d at 48; *Jana-Rock Constr., Inc.*, 438 F.3d at 204; *Pyke v. Cuomo*, 567 F.3d 74, 76 (2d Cir. 2009); *Chabad Lubavitch of Litchfield Cty., Inc. v. Litchfield Historic Dist. Comm'n*, 768 F.3d 183, 199 (2d Cir. 2014); *Congregation Rabbinical Coll. of Tartikov, Inc.*, 945 F.3d at 110-11.[8]

What's more, that rule is entirely consistent with the Supreme Court's decisions in *Arlington Heights* and *Davis*, as this Court has recognized. *See Orange Lake Assocs.*, 21 F.3d at 1226; *Hayden*, 180 F.3d at 48. In both decisions—as is usually the case when a plaintiff argues

---

[8] Other circuits agree. *See, e.g.*, *Doe*, 665 F.3d at 549 ("a plaintiff must show discriminatory impact in order to prove an equal protection violation under this third alternative"); *Lewis*, 806 F.3d at 354 ("where there is no proof of either discriminatory purpose or discriminatory effect, the government action is subject to rational basis review"); *Alston v. City of Madison*, 853 F.3d 901, 907-09 (7th Cir. 2017) (affirming grant of summary judgment on equal protection claim where plaintiff "provided no evidence that the program had a discriminatory effect or that the defendants acted with a discriminatory purpose"); *Greater Birmingham Ministries v. Sec'y of Ala.*, 992 F.3d 1299, 1321 (11th Cir. 2021) ("A successful equal protection claim under the Fourteenth Amendment requires proof of both an intent to discriminate and actual discriminatory effect.").

that a facially neutral policy violates the Equal Protection Clause—
there was no dispute that the challenged government actions had a
discriminatory effect. *Arlington Heights*, 429 U.S. at 264-65; *Davis*, 426
U.S. at 235, 239. The question for the Court was whether, in addition to
that clear discriminatory effect, the plaintiffs were *also* required to
prove discriminatory intent. *Arlington Heights*, 429 U.S. at 264-66;
*Davis*, 426 U.S. at 238-42. And in each case, the Court answered "yes":
both discriminatory intent and discriminatory effect were required. *Id.*

Plaintiffs misleadingly protest that in those cases, the Supreme
Court stated that discriminatory effect "alone is not determinative,"
*Arlington Heights*, 429 U.S. at 266, and is not the "sole touchstone" of
an equal protection claim, *Davis*, 426 U.S. at 242 (App. Br. 44-45). But
the purpose of those statements was to make clear that discriminatory
effect is not *enough* to make out a claim. The Court did not say or imply
that such a claim could survive without evidence of discriminatory
effect, or that evidence of discriminatory intent, by itself, could support
an equal protection violation. Instead, the Court held that, to challenge
a facially neutral and evenhandedly applied law, a plaintiff who has
evidence of discriminatory effect must *also* come forward with evidence

of discriminatory intent. *Arlington Heights*, 429 U.S. at 264-66; *Davis*, 426 U.S. at 238-42.

At bottom, plaintiffs' argument is that a court can find an equal protection violation based solely on evidence of discriminatory intent, even if the law or policy is (1) facially neutral, (2) evenhandedly applied, and (3) lacks discriminatory effect (*see* App. Br. 41-43). But that is not what equal protection doctrine holds. While discriminatory intent is undoubtedly a fundamental component of an equal protection violation, *Arlington Heights*, 429 U.S. at 265, mere intent without any other evidence of discrimination does not rise to the level of a constitutional violation. Neither *Davis* nor *Arlington Heights* holds otherwise, and plaintiffs cannot selectively quote their way around that fact.

And for good reason. As the Supreme Court explained in *Palmer*, "no case in this Court has held that a legislative act may violate equal protection solely because of the motivations of the men who voted for it." 403 U.S. at 224. After all, if a "law is struck down for this reason, rather than because of its facial content or effect, it would presumably be valid as soon as the legislature or relevant governing body repassed it for different reasons." *Id.* at 225. Thus, it is the "facial content or effect" of

42

the law—in addition to the government's discriminatory motives—that creates an equal protection violation. *Id.*; *see also Lewis*, 806 F.3d at 358-59. And here, DOE's SHS admissions policy is indisputably facially neutral and has not been applied in a discriminatory way—so, absent proof of discriminatory effect, summary judgment was warranted.

Plaintiffs also argue that the district court "misread" this Court's decision in *Hayden v. County of Nassau* as requiring proof of discriminatory effect in this case (App. Br. 47-49). But that is exactly what *Hayden* stands for. *See* 180 F.3d at 50-53. Plaintiffs' contrary interpretation is itself a plain misreading of that decision.

The plaintiffs in *Hayden* were white and Hispanic job applicants. They argued that Nassau County's changes to its police department entrance exam violated the Equal Protection Clause because they were designed to reduce the discriminatory impact of the test on Black applicants. *Hayden*, 180 F.3d at 46-47. In analyzing whether plaintiffs' allegations stated a valid equal protection claim, this Court first concluded that plaintiffs "fail[ed] to establish an equal protection violation under the first two theories"—express racial classifications and discriminatory enforcement. *Id.* at 48-50. Turning to the third

43

theory, the Court held that plaintiffs "fail to put forth any claims which would demonstrate either discriminatory intent or discriminatory impact." *Id.* at 50.

As to the discriminatory impact (or, effect) prong, the Court explained that white and Hispanic applicants were "unable to set forth a claim that they endured any disparate impact as a result of the design and administration" of the exam because they "continue[] to score higher than black candidates, on average." *Id.* at 52.[9] In other words, white and Hispanic applicants, as a group, suffered no discriminatory effect from Nassau County's changes to the police officer entrance exam.

Plaintiffs are thus mistaken when they claim that the Court in *Hayden* relied solely on the fact that the new exam "was administered and scored in an identical fashion for all applicants" (App. Br. 49). To the contrary, it was only after determining that the exam was facially neutral and evenhandedly administered that this Court went on to

---

[9] Plaintiffs incorrectly suggest that this holding only applied to the Title VII claim (*see* App. Br. 48-49). To the contrary, the Court in *Hayden* first concluded that plaintiffs failed to state an equal protection claim because they did not "put forth any claims which would demonstrate either discriminatory intent or discriminatory impact," since they "continue[] to score higher than black candidates, on average." 180 F.3d at 50-52. Only then did the Court go on to consider whether plaintiffs had stated a valid Title VII claim. *Id.* at 52-53.

separately assess whether the changes to the exam nevertheless had a discriminatory effect on white and Hispanic applicants and were motivated by a discriminatory purpose. *Hayden*, 180 F.3d at 48-52. *Hayden* was not focused solely on the first two theories of equal protection liability, as plaintiffs seem to suggest (App. Br. 49).

Finally, plaintiffs fault the district court for relying on *Atkins v. Westchester County Department of Social Services* (App. Br. 49-50), but that summary order simply affirmed the dismissal of an equal protection claim because plaintiffs "failed to establish … purposeful discrimination." 31 F. App'x 52, 53-54 (2d Cir. 2002). The Court did not hold that discriminatory effect was not required to maintain an equal protection claim challenging a facially neutral and evenhandedly applied policy, so the case does nothing to support plaintiffs' arguments, as they wrongly claim (App. Br. 50). Since evidence of both discriminatory effect and intent were required in that situation, the lack of discriminatory intent in *Atkins* was dispositive.

### 2. Plaintiffs' unsupported "unequal treatment" theory of equal protection liability still requires a showing of discriminatory effect.

Instead of discriminatory effect, plaintiffs argue that the relevant inquiry is "whether [d]efendants purposefully imposed unequal treatment based on race" (App. Br. 51). And they posit that DOE's use of a facially neutral criterion—the 0.60 ENI requirement—amounts to unequal treatment based on race because it excluded "heavily Asian-American" middle schools from the Discovery Program (*id.* at 53-56). Plaintiffs are mistaken, however, because "unequal treatment" by itself—in plaintiffs' intended sense of a policy without demonstrable discriminatory effect—does not support an equal protection claim in this context. And plaintiffs have not linked that purported unequal treatment to a discriminatory effect on Asian-American admissions to the SHSs.

To start, "unequal treatment" is not a meaningful analytical framework for resolving an equal protection claim, and it is particularly unhelpful given the type of claim that plaintiffs have brought: a challenge to a facially neutral and evenhandedly applied admissions policy. *See Hayden*, 180 F.3d at 50-52. Here, as plaintiffs concede (A18),

46

the Discovery Program changes were facially neutral—DOE did not use a facial classification that treated applicants unequally based on race. Nor were the changes applied in a discriminatory manner, based on race. Instead, they were applied equally to all SHS applicants regardless of race. That is why the district court, using the third prong of the *Hayden* analysis, properly granted summary judgment upon concluding that DOE's facially neutral and evenhandedly applied admissions policy had no discriminatory effect on Asian-American admissions to the SHSs—and thus did not run afoul of the Fourteenth Amendment regardless of the intent behind its adoption (SPA13-22).

Perhaps recognizing this problem, plaintiffs claim that, "if supported by a racially discriminatory motive," the government violates the Equal Protection Clause when it "implements a facially neutral policy that treats applicants differently based on a factor that is designed to operate as a proxy for race" (App. Br. 51-52). And they assert that DOE's use of the 0.60 ENI criterion is one such proxy (*id.* at 53-56). Yet, notably, plaintiffs cite no case law supporting that

argument.[10] And this Court has rejected similar efforts to recast facially neutral factors as racial classifications.

In *Hayden*, for example, the plaintiffs argued that "by designing, administering and scoring the Exam in a race-conscious way," Nassau County had "expressly treated applicants differently because of their race," and strict scrutiny should apply. 180 F.3d at 48. This Court flatly rejected that argument. It noted that the exam "did not differentiate between applicants on the basis of race" and was "administered and scored in an identical fashion for all applicants." *Id*. And although the exam was designed to "lessen the discriminatory impact on black applicants," the use of race-neutral criteria to achieve that goal did not "subject [applicants] to unequal treatment based on race." *Id*. at 49-50.

---

[10] Instead, plaintiffs attempt to support this argument with a hypothetical, and ask the Court to imagine a facially neutral admissions policy that disproportionately imposed a "more burdensome application process" on Asian-American students who, nonetheless, "were able to successfully navigate" it, leading to no disproportionate effect on admissions (App. Br. 52). But that hypothetical is not inconsistent with plaintiffs' obligation to show a discriminatory effect. In plaintiffs' hypothetical, the disproportionate burden of the application process could perhaps itself be challenged as a discriminatory effect. Their problem is that this is a new and different theory of harm, and on this record it is entirely speculative. Plaintiffs have not alleged or proved such harm here, having pressed a case based on the ultimate outcome of the admissions process.

So too here. Although DOE selected the 0.60 ENI requirement as a way to "support greater geographic, racial, and socioeconomic diversity at the SHS[s]" (A161; *see also* A82), it used a race-neutral criterion to achieve that goal. It did not treat applicants unequally based on their race.

Plaintiffs argue that DOE's use of the ENI criterion nevertheless "disproportionately affected Asian Americans" because it excluded some "majority-Asian-American middle schools" from the Discovery Program, and because the remaining eligible middle schools were less Asian American than the citywide average (App. Br. 53-56). But plaintiffs are unable to show that those ENI-driven changes in middle school eligibility for the Discovery Program had a negative effect on Asian-American admissions to the SHSs, which is what plaintiffs' equal protection claim is all about (*see* A5-22; S.D.N.Y. Dkt. 11 at 1, 18). Instead, plaintiffs are forced to concede that "Asian-American admissions to the [SHSs] as a whole fared slightly better under the new policy" (App. Br. 15). Without evidence of a discriminatory effect on Asian-American admissions to the SHSs, merely treating middle schools differently based on a race-neutral economic need criterion is

49

not enough to establish an equal protection violation. *See Hayden*, 180 F.3d at 50-52.

In any event, because Asian-American applicants actually benefited overall from DOE's policy change, the ENI requirement can hardly be said to "operate as a proxy for race" (App. Br. 51-52). If anything, ENI operates as a proxy for individual economic disadvantage by measuring community disadvantage. Put another way, DOE uses the ENI as "an estimate of the percentage of students … facing economic hardship" in a given middle school (A45), and then uses that community metric to identify the most individually disadvantaged students in the City—those who were historically excluded from the SHS admissions process (S.D.N.Y. Dkt. 50 at 12) and "face more academic challenges than similarly-situated students attending lower-poverty schools" (A45). Race does not factor into this.

Plaintiffs mistakenly assert that *North Carolina State Conference of the NAACP v. McCrory,* 831 F.3d 204 (4th Cir. 2016), supports their bid to proceed without proof of discriminatory effect (App. Br. 56-57). The court there, in analyzing whether changes to state voting laws were motivated by discriminatory *intent*, credited evidence that the revisions

50

had a "disproportionate impact" on African-American voters. *McCrory*, 831 F.3d at 232-33. During the course of that lengthy analysis, the court rejected the district court's suggestion that a slight rise in African-American voter turnout undid the disproportionate impact since, despite the rise, "many African American votes went uncounted." *Id.* at 232.

Here, unlike in *McCrory*, the discriminatory effect on Asian-American admissions was not just less than plaintiffs anticipated, but nonexistent. In any event, the alternative equal protection theory that plaintiffs assert in the course of their discussion of *McCrory*—the "harm felt" by being "excluded from Discovery" (App. Br. 56-57)—bears no relation to their allegations or their proof, and is not tied to any measurable effect on Asian-American representation at the SHSs.

In short, this Court should reject plaintiffs' novel and unsupported "unequal treatment" theory of equal protection liability. This Court has repeatedly held that where the challenged policy is facially neutral and evenhandedly applied, plaintiffs must establish both discriminatory effect and intent. *See, e.g.*, *Congregation Rabbinical Coll. of Tartikov, Inc.*, 945 F.3d at 110-11. Merely treating middle schools differently

51

based on economic need—without a corresponding discriminatory effect—does not count.

### 3. The purported small reduction in Asian-American admissions to two specialized high schools does not raise a triable issue of fact about discriminatory effect.

Despite their brief's heavy investment in a no-effects theory of equal protection, plaintiffs also argue that they managed to find some evidence of discriminatory effect that should have gotten them past summary judgment: Dr. Vigdor's analysis showing that Asian-American applicants received 0.7% fewer offers to attend Stuyvesant and 1.4% fewer offers to attend Bronx Science in 2019 and 2020 than they would have under the prior Discovery Program criteria (App. Br. 57-66). The district court, however, correctly rejected that argument because it is inconsistent with plaintiffs' theory of discrimination across all the SHSs (SPA22). In any event, as the court also noted (*id.*), the expert's analysis was based on the wrong population and is thus inadmissible.

Plaintiffs began this litigation by framing their equal protection claim as a citywide challenge to the Discovery Program and its overall impact on Asian-American admissions at the eight SHSs. The complaint

and preliminary injunction briefing repeatedly characterized their claim in that way. For example, plaintiffs complained about the disproportionate harm to Asian Americans "at each Specialized High School" (A6). And they argued that the City "intend[ed] the changes to reduce the number of Asian Americans who enroll in the Specialized High Schools" (A21; *see also* A11, 14, 22; S.D.N.Y. Dkt. 11 at 6; No. 19-550, Dkt. 36 at 28 ("Appellants alleged that the defendants' reorganization of the Discovery program violates their equal protection rights because it has the purpose and effect of reducing Asian-American enrollment at the specialized high schools.")).

It was only after discovery revealed no citywide discriminatory effect that plaintiffs shifted their theory to focus on purported (and tiny) reductions in Asian-American representation at Stuyvesant and Bronx Science (*see* A302-04). In other words, plaintiffs attempted to recast the harm they were asserting from *whether* Asian-American students were admitted to the SHSs to *which* SHSs those students were admitted to. The district court properly rejected plaintiffs' belated attempt to so materially revise their theory of the case at this late stage (SPA22). *Cf. Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir.

53

1998) (recognizing that a party may not use opposition to a dispositive motion as a means to amend the complaint).

In any event, as the district court also correctly recognized, Dr. Vigdor analyzed the wrong population (SPA22; *see also id.* at 6 n.8). He thus "d[id] not meet the statistical standards prescribed by law," *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 152-53 (2d Cir. 2012). To calculate the change in the percentage of offers received by Asian-Americans at Stuyvesant and Bronx Science, Dr. Vigdor looked to the wrong data field: he used a field that identified students who were invited to apply to the Discovery Program rather than the field for students who actually received an offer to attend the program (A212).

The problem with the invitation data is its over-inclusive sweep. The record leaves no doubt that DOE invites some number of students to apply for the Discovery Program who are not in fact eligible (A212). That is because DOE often lacks information about whether a student is individually disadvantaged—one of the eligibility requirements for the program (A89). To solve that problem, DOE sends letters to students it identifies as *potentially* eligible, inviting them to submit documentation proving that they are individually disadvantaged (*id.*). A

student who does that may be eligible for admission via the Discovery Program, depending on SHSAT score and school choices (*id.*). But the mere fact that a student has received an invitation to apply to the Discovery Program does not mean that the student is eligible, will apply, or will ultimately receive an offer.

Dr. Vigdor's use of invitation data thus focuses on the wrong population: students who may be eligible for the Discovery Program, rather than students who actually received offers to attend the program. And the City's expert determined that, based on actual Asian-American offer data—rather than the over-inclusive invitation data relied on by Dr. Vigdor—"the percentage of seats offered to Asian students" at the SHSs "increased both overall and at each of the eight [SHSs]" individually (A212-15 (emphasis omitted)).[11]

---

[11] Dr. Vigdor argued that this analysis shows only that Asian-American students invited to participate in the Discovery Program are "more likely to successfully clear" the paperwork "hurdles" imposed by DOE and that this is the reason that they "convert their 'invitations' into 'offers,'" "at rates substantially higher" than the other racial groups (A221). But, as explained above, the "hurdles" Dr. Vigdor refers to are more than mere paperwork—invitees must actually meet the eligibility requirements for the Discovery Program. And many invitees don't. The rest is just speculation.

Plaintiffs protest, and their expert argued (A220-22), that the invitation data is "more accurate[]," since DOE chooses which students will receive invitations and since it is up to the students to submit the necessary paperwork to "convert[]" the invitations into offers (App. Br. 61). But even if students submit the required paperwork, many will never receive offers because they are not actually eligible for the Discovery Program to begin with—they cannot show that they are individually disadvantaged (A212). Those ineligible students are simply not relevant to Dr. Vigdor's SHS offer analysis, so they should not have been included in his data set. Instead, the correct population to analyze is the group students who are actually eligible for—and receive offers to attend—the Discovery Program.

Plaintiffs are also incorrect that their expert's use of the wrong population amounts to a simple "dispute between the parties' experts" that is "not a proper basis for a summary judgment determination" (App. Br. 60-61). An expert's opinion about discriminatory effect that is based on the wrong "population for analysis" is not probative of discrimination and is thus irrelevant and inadmissible—it does not represent a mere conflict of opinion for a factfinder to resolve. *Smith v.*

56

*Xerox Corp.*, 196 F.3d 358, 368-70 (2d Cir. 1999) (affirming grant of summary judgment because plaintiffs' reliance "on the wrong population for their statistical analyses" meant that their statistics "lack[ed] … probative value"); *see also Hollander v. Am. Cynamid Co.*, 172 F.3d 192, 202 (2d Cir. 1999) (rejecting argument that district court "usurped the role of the jury" by rejecting evidence that was not probative of discrimination).

On top of all that, Dr. Vigdor's analysis is based on a disfavored method of analyzing discriminatory effect: comparing Asian-American representation at the SHSs before and after the changes to the Discovery Program. Plaintiffs have not pointed to any cases that apply their expert's approach to equal protection claims challenging government hiring and admissions policies.

To the contrary, courts consistently analyze discriminatory effect in that context by comparing the passing rates (or, here, offer rates) of the relevant racial groups. *See, e.g.*, *Hayden*, 108 F.3d at 52 (no discriminatory effect sufficient to support equal protection claim where white and Hispanic applicants "score[d] higher than black candidates, on average"); *Antonelli*, 419 F.3d at 276 (no discriminatory effect

sufficient to support equal protection claim where the passing rate "was remarkably similar for African-American, Hispanic and white applicants"). Plus, as the district court noted (SPA20), the First Circuit recently criticized plaintiffs' preferred methodology because, as here, the "plaintiff offer[ed] no analysis or argument for why" a court should analyze discriminatory effect by "comparing the projected admissions under the [challenged policy] to prior admissions under the predecessor plan." *Boston Parent Coal. for Academic Excellence Corp. v. Sch. Comm. of City of Boston*, 996 F.3d 37, 45-46 (1st Cir. 2021). Plaintiffs offer no answer to that criticism.

For all those reasons, the small reduction in Asian-American representation at Stuyvesant and Bronx Science that plaintiffs' expert purported to find does not raise a triable issue of fact about discriminatory effect.

## CONCLUSION

This Court should affirm the district court's judgment.

Dated: New York, NY
          April 14, 2023

                        Respectfully submitted,

                        HON. SYLVIA O. HINDS-RADIX
                        *Corporation Counsel*
                        *of the City of New York*
                        Attorney for City Appellees

By: _____
                        PHILIP W. YOUNG
                        Assistant Corporation Counsel

                        100 Church Street
                        New York, NY 10007
                        (212) 356-2375
                        phyoung@law.nyc.gov

CLAUDE S. PLATTON
DEBORAH A. BRENNER
PHILIP W. YOUNG
   *of Counsel*

59

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief was prepared using Microsoft Word, and according to that software, it contains 11,157 words, not including the table of contents, table of authorities, signature block, this certificate, and the cover.

_____
PHILIP W. YOUNG