# United States Court of Appeals
## for the Second Circuit

_____

August Term 2022

(Argued: June 14, 2023    Decided: September 24, 2024)

No. 22-2649

_____

CHINESE AMERICAN CITIZENS ALLIANCE OF GREATER NEW YORK,

*Plaintiff-Appellant,*

CHRISTA MCAULIFFE INTERMEDIATE SCHOOL PTO, INC., ASIAN AMERICAN
COALITION FOR EDUCATION, PHILLIP YAN HING WONG, YI FANG CHEN, CHI WANG,

*Plaintiffs,*

— v. —

ERIC L. ADAMS, IN HIS OFFICIAL CAPACITY AS MAYOR OF NEW YORK, RICHARD A
CARRANZA, IN HIS OFFICIAL CAPACITY AS CHANCELLOR OF THE NEW YORK CITY
DEPARTMENT OF EDUCATION,

*Defendants-Appellees,*

TEENS TAKE CHARGE, DESIS RISING UP AND MOVING, HISPANIC FEDERATION,
COALITION FOR ASIAN AMERICAN CHILDREN AND FAMILIES,

*Intervenors-Defendants-Appellees,*

ELIZABETH PIERRET, ON BEHALF OF HER MINOR SON O.R., ODUNLAMI SHOWA, ON BEHALF OF HIS MINOR CHILD A.S., TIFFANY BOND, ON BEHALF OF HER MINOR CHILD K.B, LAUREN MAHONEY, ON BEHALF OF HER MINOR CHILDREN N.D.F AND N.E.F, ROSA VELASQUEZ, ON BEHALF OF HER MINOR CHILD C.M.,

*Defendants.*

_____

Before:        CABRANES and BIANCO, *Circuit Judges*, and REISS, District Judge.*

Plaintiff-Appellant Chinese American Citizens Alliance of Greater New York ("CACAGNY"), alongside a coalition of organizations and individuals (together with CACAGNY, "Plaintiffs"), brought this suit against New York City's Mayor and Department of Education Chancellor (collectively, "the City"), alleging that the new admissions policy for the Discovery Program in the Specialized High Schools ("SHSs") violated the Equal Protection Clause because the revisions were intended to discriminate against Asian-American applicants to the SHSs by decreasing the percentage of Asian Americans admitted, and negatively impacted Asian-American students.  After partial discovery, the United States District Court for the Southern District of New York (Edgardo Ramos, *Judge*) granted the City's motion for summary judgment, concluding that Plaintiffs failed to demonstrate that the policy changes caused an aggregate disparate impact to Asian-American students at the SHSs, as required under *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977).

At the outset, we emphasize that, because Plaintiffs were not permitted to conduct any discovery with respect to the issue of discriminatory intent under the bifurcated discovery procedure utilized in the district court, we must assume (without deciding) for purposes of this appeal that Plaintiffs can prove that the policy changes to the Discovery Program were made with the discriminatory intent to reduce the number of Asian-American students at the SHSs.  With that factual assumption, we conclude that the district court erred in holding that Plaintiffs must show an aggregate disparate impact on Asian-American students

_____

* Judge Christina Reiss, of the United States District Court for the District of Vermont, sitting by designation.

in order to establish the requisite discriminatory effect for an equal protection claim under *Arlington Heights*. Instead, if discriminatory intent is proven, a negative effect or harm from that discriminatory policy on individual Asian-American students applying to the SHSs would be sufficient to trigger strict scrutiny review.

Here, it is undisputed that economically disadvantaged Asian-American students from certain middle schools, who would have been eligible for admission to the SHSs under the prior admission policy for the Discovery Program, were rendered ineligible for admission under the new policy because the Economic Need Index ("ENI") at their middle school was too high. The exclusion of those Asian-American students from the opportunity to compete for one-fifth of the admission slots at the SHSs through the Discovery Program, if the policy changes were motivated by discriminatory intent towards Asian-American students, would set forth an equal protection claim under *Arlington Heights* that would subject the new policy to strict scrutiny. Therefore, because no discovery was conducted on the issue of discriminatory intent and there is sufficient evidence of discriminatory effect if such intent is proven, summary judgment in favor of the City was unwarranted on the equal protection claim.

Accordingly, we **VACATE** the district court's grant of summary judgment, and the case is **REMANDED** to the district court for further proceedings consistent with this opinion.

GLENN E. ROPER (Joshua P. Thompson, Pacific Legal Foundation, Sacramento, California, *on the brief*), Pacific Legal Foundation, Highlands Ranch, Colorado, *for Plaintiff-Appellant*.

PHILIP W. YOUNG (Claude S. Platton and Deborah A. Brenner, *on the brief*), *for* Hon. Sylvia O. Hinds-Radix, Corporation Counsel of the City of

New York, New York, New York, *for Defendants-Appellees*.

MICHAELE N. TURNAGE YOUNG (Janai S. Nelson, Samuel Spital, Rachel Kleinman, and Kevin Jason, NAACP Legal Defense and Educational Fund, Inc., New York, New York; Jin Hee Lee and Molly M. Cain, NAACP Legal Defense and Educational Fund, Inc., Washington, District of Columbia; Sarah Hinger, American Civil Liberties Union, New York, New York; Stefanie D. Coyle, Arthur Eisenberg, and Emma Hulse, New York Civil Liberties Union Foundation, New York, New York; Francisca D. Fajana, LatinoJustice PRLDEF, New York, New York; Elizabeth A. Ritvo, Brown Rudnick LLP, Boston, Massachusetts; John G. Doyle, Brown Rudnick LLP, Washington, District of Columbia; Caitlin Felise C. Ramiro and Samuel J. Hickey, Brown Rudnick LLP, New York, New York, *on the brief*), NAACP Legal Defense and Educational Fund, Inc., Washington, District of Columbia, *for Intervenors-Defendants-Appellees*.

JOSEPH F. BIANCO, *Circuit Judge*:

In June 2018, the New York City Department of Education ("DOE") revised the admission policy at eight of its highly selective Specialized High Schools

("SHSs"), with the stated goal of creating a wider and more diverse pool of applicants for the SHSs. In particular, the new policy made changes to the "Discovery Program"—a pre-existing path for admission to SHSs for high-performing, economically disadvantaged students who would not otherwise be admitted based solely on their scores on the standardized test for admission. The changes included: (1) expanding of the number of SHS seats reserved for the Discovery Program from less than 5 percent to 20 percent of the overall SHS seats; and (2) adding a new admissions criterion for the Discovery Program, known as the "Economic Need Index" or "ENI," that focused on the economic status of the student applicant's community as a whole, rather than on an individual basis.

Plaintiff-Appellant Chinese American Citizens Alliance of Greater New York ("CACAGNY"), alongside a coalition of organizations and individuals (together with CACAGNY, "Plaintiffs"), brought this suit against New York City's Mayor and DOE's Chancellor (collectively, "the City"), alleging that the new admissions policy for the Discovery Program violated the Equal Protection Clause because the revisions were intended to discriminate against Asian-American applicants to the SHSs by decreasing the percentage of Asian Americans admitted,

and negatively impacted Asian-American students.[1]  After partial discovery, the United States District Court for the Southern District of New York (Edgardo Ramos, *Judge*) granted the City's motion for summary judgment, concluding that Plaintiffs failed to demonstrate that the policy changes caused an aggregate disparate impact to Asian-American students at the SHSs, as required under *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977).  *See Christa McAuliffe Intermediate Sch. PTO, Inc. v. De Blasio*, 627 F. Supp. 3d 253, 263 (S.D.N.Y. 2022).

At the outset, we emphasize that, because Plaintiffs were not permitted to conduct any discovery with respect to the issue of discriminatory intent under the bifurcated discovery procedure used in the district court, we must assume (without deciding) for purposes of this appeal that Plaintiffs can prove that the policy changes to the Discovery Program were made with the discriminatory intent to reduce the number of Asian-American students at the SHSs.  With that factual assumption, we conclude that the district court erred in holding that Plaintiffs must show an aggregate disparate impact on Asian-American students

---

[1]  Because the suit was brought against Mayor Bill de Blasio and Chancellor Richard A. Carranza in their official capacities, they were replaced as defendants by their successors: Mayor Eric Adams and Chancellor David C. Banks.

in order to establish the requisite discriminatory effect for an equal protection claim under *Arlington Heights*. Instead, if discriminatory intent is proven, a negative effect or harm from that discriminatory policy on individual Asian-American students applying to the SHSs would be sufficient to trigger strict scrutiny review.

Here, it is undisputed that economically disadvantaged Asian-American students from certain middle schools, who would have been eligible for admission to the SHSs under the prior admissions policy for the Discovery Program, were rendered ineligible for admission under the new policy because the ENI scores of their middle schools were too low. The exclusion of those Asian-American students from the opportunity to compete for one-fifth of the admission slots for the SHSs through the Discovery Program, if the policy changes were motivated by discriminatory intent towards Asian-American students, would set forth an equal protection claim under *Arlington Heights* that would subject the new policy to strict scrutiny. Therefore, because no discovery was conducted on the issue of discriminatory intent and there is sufficient evidence of discriminatory effect if such intent is proven, summary judgment in favor of the City was unwarranted on the equal protection claim.

Accordingly, we **VACATE** the district court's grant of summary judgment and **REMAND** the case to the district court for further proceedings consistent with this opinion.

## BACKGROUND

### I.   New York City's Specialized High Schools

Since the early 20th century, New York City has operated SHSs in an effort to meet the needs of academically gifted students.  The original three SHSs, Stuyvesant High School, Bronx High School of Science, and Brooklyn Technical High School, are widely considered to be among the finest high schools in the United States.  Their distinguished alumni include more than a dozen Nobel laureates.

Over the years, the DOE has expanded its SHS system to include six additional schools.  These schools are also highly regarded.  Because there are many more students who wish to attend the SHSs than there are available seats at the schools, admission to the SHSs is competitive.

SHS admission is determined by the results of an entrance exam called the Specialized High School Admissions Test ("SHSAT").  By the late 1960s, the SHSs also offered an alternative path to admission, called the Discovery Program, for a

limited number of disadvantaged students who demonstrated potential for success at the SHS, but did not obtain a qualifying score on the standardized entrance exam. The New York legislature codified this two-path admission structure with its enactment of the Hecht-Calandra Act in 1971.[2] *See* N.Y. EDUC. LAW § 2590-h(1)(b); *see also id.* § 2590-g(12) (1996).

The entrance exam route works as follows. Prospective students rank the SHSs in preferential order. The DOE then ranks the students by their scores on the SHSAT. Starting with the highest scorer, students are placed into their highest-ranked school with available seats. This cycle continues until all seats are filled. The lowest SHSAT score required to gain admission to each school is termed the "cutoff score."

Under state law, the SHSs may admit students who do not meet the cutoff scores if they qualify for the Discovery Program. This alternative avenue was intended "to give disadvantaged students of demonstrated high potential an opportunity to try the special high school program without in any manner

---

[2] This admission structure applies to eight of the nine SHSs. The ninth SHS, Fiorello H. LaGuardia High School of Music and the Arts, relies on auditions, rather than SHSAT scores. Therefore, the use of "SHSs" in this opinion refers only to the eight schools that make admissions decisions based on SHSAT scores.

interfering with the academic level of these schools."  N.Y. EDUC. L. § 2590-g(12)(d) (1996).  To be eligible for the Discovery Program, students must take the SHSAT, be certified as "disadvantaged" and be recommended as having high potential by their middle schools, and also pass a summer preparatory program.  *Id.*  The SHSs then consider these students in order of their SHSAT scores.

Beyond this general framework, the statutes leave many details about the Discovery Program to be determined by the DOE.  In particular, the DOE determines the parameters of the "disadvantaged" eligibility requirement, as well as the number of seats at the SHSs that are reserved for the program.

Before 2018, the DOE considered students to be "disadvantaged" if they:  (1) qualified for free or reduced-price lunch; (2) received financial assistance from the City; (3) were a foster child, ward of the state, or lived in temporary housing; or (4) were English Language Learners who enrolled in DOE schools for the first time within the preceding four years.

The exact number of Discovery Program students admitted to the SHSs has fluctuated over the years, but it has traditionally been dwarfed by the SHSAT admission route.  For instance, between 2006 and 2015, annually only approximately 1 percent to 3 percent of students admitted at the SHSs came

through the Discovery Program.  The remaining 96 percent to 99 percent gained admission solely based on their SHSAT scores.

This two-path approach to admission at the SHSs has been criticized by some for failing to promote sufficient racial diversity at those schools.  During the 2017–18 school year, the City's public school system was approximately 40 percent Latino, 26 percent Black, 16 percent Asian American, and 15 percent White. However, the statistics at the SHSs were very different.  For example, at Stuyvesant High School, Bronx High School of Science, and Staten Island Technical High School, Latino and Black students made up between 2.7 and 6.2 percent, and 0.7 and 2.5 percent, of the student bodies, respectively.  Across the SHSs as a whole, only 10 percent of students were Black or Latino.  On the other hand, a plurality of students at every one of the SHSs was Asian American, including majorities at each of the original three SHSs.

## II.    Changes to the Discovery Program

Near the end of the 2017–18 school year, then-Mayor de Blasio and then-Chancellor Carranza announced a policy designed to increase the numbers of Black and Latino students at the SHSs.  The day before announcing the changes, Mayor de Blasio wrote an op-ed arguing that the racial demographics of the SHSs

were a "monumental injustice" and asking: "Can anyone defend this? Can anyone look the parent of a Latino or black child in the eye and tell them their precious daughter or son has an equal chance to get into one of their city's best high schools?" Joint App'x at 236–37. Mayor de Blasio sought to address this "injustice" by overhauling the Discovery Program.

More specifically, under the new policy, the Discovery Program no longer would be a narrow alternative admission path. Instead, each SHS would now be required to set aside 20 percent of its seats for Discovery Program students, a dramatic increase from the 1 percent to 3 percent of seats that were previously reserved. At the same time, the term "disadvantaged" was redefined. To be eligible under the revised definition, students not only had to be individually disadvantaged, but also had to attend a "disadvantaged" middle school. To determine whether a particular middle school qualified as such, the DOE would rely on a school's ENI—a metric designed as a heuristic for the economic hardship of the community the school serves. ENI scores range from 0.0 to 1.0, with higher scores representing greater economic need.[3] Under the new policy, students

---

[3] A school's ENI is the mean of its individual students' economic need values ("ENV"). A student's ENV is calculated in one of two ways. If a student lives in a household eligible for public assistance, has lived in temporary housing during the past four years,

would only qualify for the Discovery Program if they attended middle schools with an ENI score of 0.6 or higher.

The City acknowledges that "DOE selected the 0.60 ENI requirement as a way to 'support greater geographic, racial, and socioeconomic diversity at the SHS[s].'" Appellees' Br. at 49 (quoting Joint App'x at 161 (City's press release announcing changes to the Discovery Program)). City officials arrived at the 0.6 ENI threshold after modeling the effects that various ENI cutoffs would have on the racial composition of students at the SHSs. More specifically, as Mayor de Blasio's press release emphasized, the City's modeling suggested that the revised Discovery Program would result in 16 percent of offers at SHSs going to Black and Latino students—up from the then-current 9 percent rate. Touting these effects, the press release presented the revised Discovery Program as an important step in making the admission process to the SHSs "fairer." Joint App'x at 160.

SHS admission is a zero-sum game in that admitting more students from a particular demographic means admitting fewer from other demographics. Thus,

---

or has a home language other than English and first enrolled in a DOE school within the preceding four years, then the student's ENV is 1.0. Otherwise, a student's ENV is the percentage, divided by 100, of families with school-age children in the student's census tract with incomes below the poverty level.

the City's modeling also projected that the changes to the Discovery Program would decrease the number of Asian Americans at the SHSs. Although the revised admissions policy was facially race-neutral, many Asian-American organizations believed that it unfairly discriminated against high-achieving Asian-American students. Defending the City's policy changes against this charge, Chancellor Carranza stated, "I just don't buy into the narrative that any one ethnic group owns admissions to these schools." Joint App'x at 18.

## III. Procedural Background

In December 2018, a collection of organizations and parents of individual Asian-American students sued Mayor de Blasio and Chancellor Carranza, alleging that the facially race-neutral Discovery Program revisions violated the Fourteenth Amendment's Equal Protection Clause because they were motivated by discriminatory intent and would produce discriminatory effects. Plaintiffs moved for a preliminary injunction to halt implementation of the changes. The district court denied this motion, concluding that Plaintiffs were unlikely to succeed on the merits. *Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio*, 364 F. Supp. 3d 253 (S.D.N.Y. 2019). Plaintiffs appealed.

While that appeal was pending, the City executed its planned changes to the Discovery Program. Admission to the SHSs for the 2019–20 school year was governed by the revised Discovery Program.[4]

Contrary to the City's pre-policy modeling, its internal data revealed that the 2019–20 admission cycle saw the proportion of Asian Americans admitted to the SHSs increase. The City believed these results would defeat Plaintiffs' claims of discrimination and, thus, moved to bifurcate discovery. Phase I would cover the impact of the Discovery Program changes, while Phase II would address the intent behind the changes. According to the City, this bifurcation would avoid burdensome discovery production because Plaintiffs would not be able to show discriminatory effect—a necessary element of their claim—thereby making discovery into policymakers' intent unnecessary. Over Plaintiffs' objection, the district court ordered the bifurcation of discovery.[5]

---

[4] In May 2019, several organizations and parents of individual students moved to intervene as defendants based on their "interest in the increased racial diversity of the student bodies at the [SHSs], and the decreased isolation of Black and Latinx students at those schools, which the expanded Discovery Program is likely to address." Dist. Ct. Dkt. No. 87 at 2–3. The district court granted the proposed intervenors' motion.

[5] Two months later, we affirmed the district court's denial of a preliminary injunction, finding that Plaintiffs had not established standing to seek prospective relief. *Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio*, 788 F. App'x 85 (2d Cir. 2019) (summary order). On remand, the organizational plaintiffs submitted supplemental declarations

The City supplied its 2019–20 admission data to Plaintiffs during Phase I discovery. As noted *supra*, this data indicated that the revised Discovery Program did not reduce the overall proportion of Asian Americans who were admitted to the SHSs. In particular, although the data revealed that SHS offers for Black and Latino students increased to 16.7 percent of SHS offers, Asian-American representation at the SHSs increased overall from 51 to 53 percent. The data further indicated that increases in Black and Latino representation were primarily offset by a decrease in offers to White students. *See* Joint App'x at 339 (noting that the changes caused the proportion of offers to White students to drop from 25.8 to 22.4 percent).

The inaccuracy of the City's modeling appears to be attributable, at least in substantial part, to dramatic increases in the ENI across New York City in 2018. Although it is not entirely clear what caused this spike, the increase meant that nearly one hundred middle schools that would otherwise have been excluded from the Discovery Program now met the 0.6 ENI threshold. Consequently, the racial demographics of eligible middle schools under the Discovery Program

_____

discussing the prospective harm they faced due to the Discovery Program changes, thereby curing their lack of standing, as the City conceded in district court.

looked quite different from those in the City's models, and the projected decrease in overall Asian-American representation at SHSs failed to materialize.

However, that is not to say that the revised Discovery Program did not have an impact on individual Asian-American students. For example, many Asian-American students were excluded from eligibility for the Discovery Program, including all of the students at 11 majority-Asian-American middle schools, because the ENI at their schools did not rise above the 0.6 threshold. Additionally, under the revised Discovery Program, the number of Asian Americans receiving offers to the two most selective SHSs, Stuyvesant and Bronx Science, declined.

Upon completion of Phase I discovery, the City moved for summary judgment, arguing that Plaintiffs failed to demonstrate the requisite disparate impact needed to sustain an *Arlington Heights* claim.

The district court granted summary judgment in the City's favor. *Christa McAuliffe Intermediate Sch. PTO, Inc.*, 627 F. Supp. 3d at 269. The district court held that, under *Arlington Heights*, Plaintiffs could not prevail on their equal protection challenge to the revised Discovery Program policy unless they demonstrated discriminatory intent and discriminatory effect, and the effect must show that "the policy has disproportionately affected a racial group in the aggregate." *Id*. at 261–

63. In doing so, the district court rejected Plaintiffs' contention that discriminatory effect could be shown by the "unequal treatment" of those particular Asian-American students negatively impacted by the new eligibility criteria, absent evidence of aggregate harm. *Id*. at 263–65.

Applying this legal standard for discriminatory effect, the district court determined that, under any of the various methodologies proposed by the parties to measure disparate impact, Plaintiffs had failed to provide evidence that the reforms to the Discovery Program negatively affected Asian-American students in the aggregate. *Id*. at 266–67. More specifically, the district court found that, even using Plaintiffs' proposed methodology, the equal protection claim failed because "[c]ompared to 2018, when the reforms to Discovery were not yet in effect, both in 2019 and 2020, the percentage of offers received by Asian American students *increased* [at the SHSs], the offer-rate among Asian Americans *increased*, and the spread between Asian American students' share of offers and share of test-takers *increased*." *Id*. at 267. Thus, because "[t]his data demonstrate[d] that Asian-American students ha[d] fared better [in the aggregate] *after* the reforms than before them," the district court "[found] that the changes to [the] Discovery [Program]—irrespective of the motive behind their passage—have not resulted in

a discriminatory effect on Asian Americans." *Id*. The district court further concluded that the reduction in the proportion of Asian-American students in the pool of students admitted by Stuyvesant and Bronx Science—a difference of 0.7 percentage points and 1.4 percentage points, respectively, based on the report of Plaintiffs' expert—was too "minor" to show a disproportionate impact on Asian-American students. *Id*. at 268. Additionally, the district court emphasized that "[it did] not accept that trends in two of the eight Schools can sustain Plaintiffs' disparate impact claim." *Id*. at 268–69. Finally, because it found no discriminatory effect resulting from the facially neutral admissions policy, the district court noted that it did not need to "reach any conclusion with respect to whether [the City] enacted the reforms with discriminatory intent." *Id*. at 269. CACAGNY filed a timely appeal.

## DISCUSSION

CACAGNY argues that the district court committed two legal errors in granting summary judgment to the City on its equal protection claim. First, CACAGNY contends that the district court erred in concluding that an aggregate disparate impact is required to demonstrate a discriminatory effect under *Arlington Heights*. In particular, CACAGNY argues that "[i]f Defendants intended

19

to discriminate against Asian-American students but merely failed to correctly model and anticipate the racial effect of their policy, the lack of an aggregate effect does not excuse the unequal treatment that the policy imposes on Asian-American students at middle schools excluded from [the] Discovery [Program]." Appellant's Br. at 15. Second, CACAGNY asserts that, in assessing discriminatory effect, the district court erred by disregarding evidence from "Plaintiffs' expert analysis [that] showed that under the revised Discovery [P]rogram, some Asian-American applicants who would have received invitations to Stuyvesant and Bronx Science (their preferred schools) before the admissions changes were instead denied admission to those schools." *Id*. at 16. In short, CACAGNY contends that "[e]qual protection is an individual right, and the harm these individual students suffered due to the Discovery [P]rogram changes means that Plaintiffs should at least be allowed discovery into Defendants' discriminatory purpose." *Id*.

We review *de novo* the grant of summary judgment, "construing the evidence in the light most favorable to the party against whom summary judgment was granted and drawing all reasonable inferences in that party's favor." *Bey v. City of New York*, 999 F.3d 157, 164 (2d Cir. 2021). Summary

judgment must be granted if the moving party "shows that there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The Equal Protection Clause prohibits states from "deny[ing] to any person within [their] jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. The Clause's "central purpose is to prevent the States from purposefully discriminating between individuals on the basis of race." *Shaw v. Reno*, 509 U.S. 630, 642 (1993). Thus, a state law or policy that discriminates on the basis of race is subject to strict scrutiny, regardless of its intended beneficiaries. *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995).

Applying Supreme Court precedent, we have generally recognized three types of discriminatory laws: (1) a facially discriminatory law or policy that expressly classifies individuals on the basis of race; (2) a facially neutral law that is enforced in a discriminatory fashion; and (3) a facially neutral law that was adopted with discriminatory intent and resulted in a discriminatory effect. *See Chabad Lubavitch of Litchfield Cnty., Inc. v. Litchfield Hist. Dist. Comm'n*, 768 F.3d 183, 199 (2d Cir. 2014).

It is undisputed that the revised Discovery Program neither expressly classifies students on the basis of race, nor is enforced in a discriminatory manner. Instead, Plaintiffs allege that the revised Discovery Program is a facially neutral policy motivated by an intent to reduce the number of Asian-American students and increase the number of other minority students, and has resulted in a discriminatory effect on Asian-American students. As such, in order to subject the revised Discovery Program to strict scrutiny review, Plaintiffs are required to show that, in addition to having a discriminatory effect, the policy "was adopted with a discriminatory intent." *Chabad Lubavitch*, 768 F.3d at 199. Plaintiffs may offer circumstantial or direct evidence to show that the challenged state action was motivated by an invidious discriminatory purpose. *Arlington Heights*, 429 U.S. at 266.

As a threshold matter, and one determinative of the issues here, we emphasize the primacy of the district court's decision to bifurcate discovery on our legal analysis in this particular case. The district court limited the first phase of discovery to examining the effect of the revised Discovery Program and allowed the City to move for summary judgment following its completion, without any second phase discovery on the issue of whether the City intended to discriminate

against Asian-American students. Therefore, as the City concedes, for purposes of the summary judgment motion, the district court was required to assume *arguendo* that the revised Discovery Program was motivated by an intent to harm Asian-American students. The question before us is the quantum of discriminatory effect that a plaintiff must demonstrate to challenge a facially neutral law or policy that was adopted with discriminatory intent.

The district court held that, even if there were independent evidence establishing discriminatory intent toward a particular race or ethnicity, an aggregate disparate impact on the affected class is necessary for a plaintiff to show the requisite discriminatory effect to prevail on an equal protection claim. Therefore, the district court determined that, because Plaintiffs failed to show that the revised Discovery Program had an aggregate disparate impact on Asian-American applicants to the SHSs, Plaintiffs' equal protection claim must fail. This was error.

As set forth below, neither the precedent of the Supreme Court nor the precedent of this Court has so limited the scope of the Equal Protection Clause's protections. Although an aggregate disparate impact is often the manner in which a plaintiff seeks to prove both discriminatory intent and effect as required for an

equal protection challenge to a facially neutral law, it is not the exclusive means for establishing such a violation. In other words, when a policy is motivated by an intent to discriminate against persons of a particular race, and plaintiffs who belong to that race have suffered harm as a result, the Equal Protection Clause provides for strict scrutiny review of that policy, even if there is no evidence that the discriminatory policy has resulted in negative impact on individuals of that race at an aggregate level.

## I. Discriminatory Effect under *Arlington Heights*

In the decades since *Arlington Heights*, we have repeatedly re-affirmed that "a facially neutral statute violates equal protection if it was motivated by discriminatory animus and its application results in a discriminatory effect." *Hayden v. Cnty. of Nassau*, 180 F.3d 42, 48 (2d Cir. 1999); *see also United States v. City of Yonkers*, 96 F.3d 600, 611 (2d Cir. 1996) ("A plaintiff is required to show not only that the state action complained of had a disproportionate or discriminatory impact but also that the action was taken with intent to discriminate."). In the case of a facially neutral policy, overlapping facts may be relevant to these two inquiries. For example, when a facially neutral policy results in an aggregate disparate impact, that group-wide effect might serve to establish discriminatory

effect and might allow for an inference regarding the decisionmakers' discriminatory animus. However, neither the Supreme Court nor this Court has ever held that an aggregate disproportionate impact to a racial group is a prerequisite to an equal protection violation if a plaintiff can demonstrate, through other evidence, that a law or policy motivated by a discriminatory intent has resulted in some type of discriminatory effect or impact to one or more individuals based on their race.

In *Arlington Heights* and its predecessor, *Washington v. Davis*, 426 U.S. 229 (1976), the Supreme Court addressed how a plaintiff can prove that a facially neutral policy violates the Equal Protection Clause and concluded that disparate impact alone is insufficient to prevail on such a claim. In particular, in *Davis*, the Court held that "[d]isproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination forbidden by the Constitution." 426 U.S. at 242. Instead, even if a law "affects a greater proportion of one race than of another," it does not establish an equal protection claim unless it also has "an invidious discriminatory purpose," which "may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another." *Id*.

A year later, in *Arlington Heights*, the Supreme Court held that "*Davis* does not require a plaintiff to prove that the challenged action rested solely on racially discriminatory purposes," but rather "proof that a discriminatory purpose has been a motivating factor" is sufficient. 429 U.S. at 265–66. The Court further explained that determining whether "discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id.* at 266.

"Proving the motivation behind official action is often a problematic undertaking," as officials rarely make outright pronouncements of their discriminatory motives. *Hunter v. Underwood*, 471 U.S. 222, 228 (1985). Thus, because direct evidence of discriminatory intent may not be available, circumstantial evidence of disparate impact may be "an important starting point" in determining whether a facially race-neutral policy or decision was motivated by a discriminatory purpose. *Arlington Heights*, 429 U.S. at 266; *see also Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S. 1, 34 (2020) (listing "disparate impact on a particular group" as "[p]ossible evidence" in an *Arlington Heights* inquiry (emphasis added)); *Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 487 (1997) ("[T]he impact of an official action is *often* probative of why the action was taken

in the first place since people usually intend the natural consequences of their actions." (emphasis added)).  Accordingly, aggregate disproportionate impact on a particular racial group *may* be evidence of discriminatory animus or discriminatory effect; however, we have never held that such impact is necessary to show that a facially neutral law violates the Equal Protection Clause.  *See generally Cooper v. Harris*, 581 U.S. 285, 319 (2017) ("[I]n no area of our equal protection law have we forced plaintiffs to submit one particular form of proof to prevail.").

Turning to the case at hand, the district court erroneously concluded that "irrespective of the motive behind [the] passage" of the reforms to the Discovery Program, Plaintiffs could not as a matter of law demonstrate discriminatory effect without evidence that such reforms impacted Asian-American students in the aggregate at the SHSs.  627 F. Supp. 3d at 267.  This conclusion is at odds with precedent from this Court and the Supreme Court.  Indeed, it is axiomatic that "[a]t the heart of the Constitution's guarantee of equal protection lies the simple command that the Government must treat citizens as individuals, not as simply components of a racial, religious, sexual or national class."  *Miller v. Johnson*, 515 U.S. 900, 911 (1995) (internal quotation marks and citation omitted).

Therefore, if the government enacts a law or policy with a proven discriminatory motive against a certain race (as we must assume here for purposes of this appeal given the bifurcation of discovery), a valid equal protection claim can be based on a showing that any individual has been negatively affected or harmed by that discriminatory law or policy based on race, even if there is no disparate impact to members of that racial class in the aggregate.[6] *See generally Soule v. Conn. Assoc. of Schs., Inc.*, 90 F. 4th 34, 46 (2d Cir. 2023) ("The Supreme Court has identified discriminatory treatment as an example of a concrete, *de facto*, injury. In cases involving claims of discriminatory treatment, the alleged harm is frequently twofold: plaintiffs are discriminated against and that discriminatory treatment results in the denial of certain benefits that they would otherwise have enjoyed." (internal quotation marks and citation omitted)). Put simply, a racially-motivated, facially neutral policy that excludes some individuals from a

---

[6] This equal protection claim can be asserted by individuals alleging they suffered harm from the discriminatory policy or law, as well as other individuals (such as a parent or guardian) or organizations that also have standing to sue. *See Warth v. Seldin*, 422 U.S. 490, 511 (1975). Here, following our remand, the organizations who are named Plaintiffs asserted both associational standing on behalf of their members and/or institutional standing to sue in their own right to pursue injunctive relief, and submitted a declaration in support of their arguments. As noted *supra*, following those submissions in the district court, the City did not contest standing and we conclude that Plaintiffs (including CACAGNY) have standing to sue based on this record.

government program based on their race is not immunized from strict scrutiny because it underperforms in an unconstitutional mission with respect to a targeted racial group in the aggregate. As the Supreme Court has emphasized, "[i]nvidious discrimination does not become less so because the discrimination accomplished is of a lesser magnitude." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 277 (1979).

We do not suggest that an equal protection claim challenging a facially neutral policy does not require a showing of discriminatory effect; controlling precedent clearly states that it does. *See Hayden*, 180 F.3d at 50–52; *see also Palmer v. Thompson*, 403 U.S. 217, 224 (1971) ("[N]o case in this Court has held that a legislative act may violate equal protection solely because of the motivations of the men who voted for it."). CACAGNY does not argue otherwise. *See* Reply Br. at 23 (arguing that *Palmer* "is perfectly consistent with Plaintiffs' argument, which is that Defendants' discriminatory intent *plus* the unequal treatment inflicted on Asian-American students at excluded middle schools violates the Equal Protection Clause"). Instead, we hold that, when a discriminatory intent in enacting a facially neutral law or policy is shown, the requisite proof of a discriminatory effect is not limited to an aggregate disparate harm, but rather can be satisfied by proof of an

adverse harm to one or more individuals based on their race that has resulted from that discriminatory law or policy.

Although the district court relied upon prior decisions in which we have affirmed the dismissal of equal protection claims, those cases are inapposite. For example, in *Hayden*, we held that the district court properly dismissed an equal protection challenge to the Nassau County Police Department's redesign of its entrance examination. In doing so, we explained that plaintiffs failed to "sufficiently allege that Nassau County harbored an intent to discriminate against them" and also had "fail[ed] to set forth allegations which would support a claim that they were adversely impacted by the redesign of the police officers' entrance exam." 180 F.3d at 50–52. Here, by contrast, due to the bifurcation of discovery below, we must presume discriminatory intent. In other words, we must presume that the Asian-American students who have been rendered ineligible for the Discovery Program by virtue of the middle school they attend—despite otherwise having qualified for admission on an individual basis under the previous criteria—were excluded from those designated SHS seats precisely because of their race. Thus, given the limited discovery in this case, evidence that Asian-American students at certain middle schools are no longer eligible for the

Discovery Program under the new policies suffices to establish that they were adversely impacted. Neither the holding in *Hayden*, nor any other precedent, suggests that the equal protection claim would fail as a matter of law under such factual circumstances. Instead, to sustain an equal protection claim under *Arlington Heights* when intent has been established, plaintiffs need only demonstrate that they suffered some harm from the law or policy, not an aggregate disparate impact to the racial group they have proven was targeted.

The cases the City cites to support affirmance miss the point. Those cited cases stand for the well-settled proposition that a plaintiff must prove both discriminatory effect *and* intent under *Arlington Heights*. *See, e.g., Pyke v. Cuomo*, 567 F.3d 74, 78 (2d Cir. 2009) ("[a]ssuming without deciding" that the plaintiffs could establish discriminatory impact, but concluding that "they have nonetheless failed to proffer enough evidence of discriminatory intent to survive summary judgment" (emphasis omitted)); *Jana-Rock Constr., Inc. v. New York State Dep't of Econ. Dev.*, 438 F.3d 195, 212 (2d Cir. 2006) (declining to apply strict scrutiny to a New York affirmative action program "[w]ithout any indication" of a discriminatory purpose); *Orange Lake Assocs., Inc. v. Kirkpatrick*, 21 F.3d 1214, 1226 (2d Cir. 1994). However, nothing in our jurisprudence suggests that aggregate

disparate impact is the only manner in which the requisite discriminatory effect can be shown. For example, the City relies on our decision in *Orange Lake*, in which we addressed whether a facially neutral zoning amendment that allegedly had a disparate impact on racial minorities violated the Equal Protection Clause. 21 F.3d at 1225–27. In finding that the amendment should not be subjected to strict scrutiny, we noted that the plaintiff had failed to put forth any evidence of disparate impact and, "[m]ost important[ly]," the plaintiff had made "only conclusory allegations that the members of the Town Board were motivated by racial animus and fail[ed] to point to any evidence of such motivation." *Id*. at 1227. In reaching this decision, we did not suggest that aggregate disparate impact was the only means to prove either discriminatory intent or effect.

The recent decisions by the Fourth and First Circuits relied upon by the City are similarly inapposite. *See Coal. for TJ v. Fairfax Cnty. Sch. Bd*., 68 F.4th 864 (4th Cir. 2023) cert. denied, --- U.S. ---, 218 L. Ed. 2d 71 (Feb. 20, 2024*); Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of City of Bos*., 996 F.3d 37 (1st Cir. 2021). To be sure, in these cases, each court examined the group-wide effects of a challenged admissions policy in determining whether members of an allegedly targeted group had suffered disparate impact. *Coal. for TJ*, 68 F.4th at 882; *Bos. Parent Coal.,*

996 F.3d at 46. However, in each case, the court found no evidence of discriminatory intent, and the lack of a group-wide effect was examined in that context. *Coal. for TJ*, 68 F.4th at 886 ("An Equal Protection plaintiff alleging purposeful racial discrimination must show at least some specific intent to target a certain racial group and to inflict adverse effects upon that group. In this situation, the undisputed facts show only that the Board intended to improve the overall socioeconomic and geographic diversity of TJ's student body. . . . In sum, the [plaintiff] cannot satisfy its burden of proving that the Board's adoption of the race-neutral challenged admissions policy was motivated by an invidious discriminatory intent, whether by way of 'racial balancing,' 'proxies,' or otherwise."); *Bos. Parent Coal.*, 996 F.3d at 48 (noting that there is "no likely error in the district court's conclusion that a discriminatory purpose did not motivate the Plan's adoption" and affirming the district court's denial of preliminary injunction).

In contrast, here, due to the limitation on discovery below, we must assume that the reforms to the Discovery Program were motivated by the specific intent to target Asian-American students. *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 746 (2007). And, in conjunction with that presumed

invidious discriminatory intent, CACAGNY has set forth evidence of Asian-American students who have suffered a discriminatory effect from the new policies, including those Asian-American students at certain middle schools excluded entirely from the Discovery Program under the new criteria. Unlike here, neither *Coalition for TJ* nor *Boston Parent Coalition* assumed or found that the intent-to-discriminate element of plaintiffs' equal protection claim was satisfied. *See, e.g., Coal. for TJ*, 68 F.4th at 888 (Heytens, *J.*, concurring) ("Under the policy challenged here, no students are told 'where they can and cannot go to school based on the color of their skin.'" (quoting *Parents Involved*, 551 U.S. at 747)).

In sum, we hold that under *Arlington Heights*, when an individual of a certain race is denied access to a program or is otherwise adversely affected by a facially neutral law or policy that is racially motivated, a viable equal protection claim exists even if the individual's racial group did not suffer an aggregate disparate impact from that law or policy.[7]

---

[7] We also emphasize that, because we are presuming intent, our holding in no way undermines, or even implicates, the Supreme Court's guidance in *Feeney*, applied by this Court and other circuits under the *Arlington Heights* standard, namely, that "[d]iscriminatory purpose . . . implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part *because of*, not merely *in spite of*, its adverse effects upon an identifiable group." 442 U.S. at 279 (internal quotation marks and citation omitted) (emphasis added); *accord Howard v. Senkowski*, 986 F.2d 24, 27 (2d Cir. 1993); *see*

## II.     Evidence of Discriminatory Effect from the Discovery Program

There is sufficient evidence at this stage in the litigation that the revised Discovery Program has a discriminatory effect on Asian-American applicants seeking admission to SHSs to preclude summary judgment on the equal protection claim and require discovery on the issue of discriminatory intent.

The loss of an opportunity based on race is an actionable harm under the Equal Protection Clause. *See Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 319–20 (1978) (explaining that an equal protection violation occurred because certain applicants were, due to their race, "totally excluded from a specific percentage of seats in an entering class" while "the preferred applicants have the opportunity to compete for every seat in the class"). The requisite harm or effect is no different when the racial motivation is hidden beneath a facially neutral law or policy, which is proven to have the same discriminatory motivation. *See Students for Fair*

---

*also Coal. for TJ*, 68 F.4th at 886 ("[T]he simple fact that the Board may have been able to discern that expanding [the school's] Black and Hispanic student population might—as a "natural and foreseeable consequence"—impact the enrollment figures for Asian American students (or students of another racial group) is, under *Feeney,* wholly insufficient from which to infer constitutionally impermissible intent." (quoting *Feeney*, 442 U.S. at 278)); *Bos. Parent Coal.*, 996 F.3d at 48 ("The fact that public school officials are well aware that race-neutral selection criteria . . . are correlated with race and that their application would likely promote diversity does not automatically require strict scrutiny of a school system's decision to apply those neutral criteria.").

*Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 230 (2023) ("What cannot be done directly cannot be done indirectly. The Constitution deals with substance, not shadows, and the prohibition against racial discrimination is levelled at the thing, not the name." (alteration adopted) (internal quotation marks and citation omitted)); *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 220 (4th Cir. 2016) ("If discriminatorily motivated, such [facially neutral] laws are just as abhorrent, and just as unconstitutional, as laws that expressly discriminate on the basis of race."). Once discriminatory motive is established, or as here, assumed, a statute's facial neutrality becomes immaterial. The exclusion resulting from a discriminatorily motivated law, in those circumstances, is a sufficient discriminatory effect that would preclude summary judgment.[8]

It is undisputed that a large group of Asian-American students at certain middle schools across New York City was excluded from the revised Discovery

_____

[8] The parties disagree regarding the proper methodology for measuring disparate impact. We need not address those methodologies because the evidence of discriminatory effect that precludes summary judgment is not dependent upon the aggregate impact, but rather the exclusion of Asian-American students in numerous middle schools from the Discovery Program based upon what Plaintiffs may be able to prove (once they are given discovery) was a discriminatory motive in enacting the new admissions criteria.

Program under the new criteria.[9]   The new criteria for the Discovery Program

restricted eligibility to students who attended schools in a community with an ENI

of 0.6 or greater.   Under that new criteria, 11 of 24 majority-Asian-American

middle schools were rendered ineligible for the Discovery Program.   The Asian-

American students at those 11 middle schools were thus excluded from a fifth of

all SHS seats under the new Discovery Program, even if they were economically

disadvantaged on an individual basis and would have qualified for the Discovery

Program under the prior admissions policies.   This exclusion, assuming (as we

must here) that the revisions to the program were motivated by an intent to

_____

[9] The City suggests that Plaintiffs based their equal protection claim on the anticipated aggregate disparate impact on Asian-American students at the SHSs and, thus, should not be able to "materially revise" their theory of discrimination by pointing to negative effects on subsets of Asian-American students at certain middle schools.   Appellees' Br. at 53.   We are unpersuaded.   As an initial matter, the district court addressed the merits of Plaintiffs' claims of non-aggregate discriminatory effect and granted summary judgment on that basis.   In any event, although the complaint alleged that the revisions to the Discovery Program would "disproportionately harm[] Asian-American students by decreasing the number of students who can gain admission without [the] Discovery [Program]," Joint App'x at 6, it also alleged, *inter alia*, that:  (1) "[the City's] plan to expand and reorganize the Discovery Program for admission into New York City's [SHSs] is intended to racially balance the schools by limiting the number of Asian Americans who are admitted"; (2) "the precise impact of the changes is unknowable before they go into effect"; and (3) "[i]ndividual school data also shows that [the City's] plan targets for exclusion from [the] Discovery [Program] heavily Asian-American schools that are known to send many students to the [SHSs]," *id.* at 20–21.   Accordingly, we conclude that nothing in the pleadings limits Plaintiffs' equal protection claim to harm to Asian-American students at an aggregate level.

discriminate against Asian-American students, is sufficient to constitute a discriminatory effect under *Arlington Heights* and would be sufficient to trigger strict scrutiny review of the revised Discovery Program under the Equal Protection Clause.

The existence of an equal protection claim under such circumstances is not undermined by the fact that "the percentage of offers received by Asian American students who took the SHSAT increased in 2019 and 2020 more than they would have if offers had been made using the admissions criteria for the 2018 entering class" and the new criteria resulted in a slight increase in the representation of Asian-American students in the SHSs as a whole. 627 F. Supp. 3d at 260. Based on this statistic, the Intervenors argue that Asian Americans cannot show discriminatory effect because, "[w]hile CACAGNY may be able to point to isolated instances where individual students fared worse under a new policy, at the same time, there are no doubt many Asian-American applicants who fared *better*." Intervenors-Appellees' Br. at 32. However, as CACAGNY correctly notes, "[t]he slight overall increase in Asian-American admission to the specialized schools as a whole is of no comfort to the individual Asian-American students who were disproportionately excluded from Discovery [P]rogram eligibility by the 0.6 ENI

cutoff." Reply Br. at 21. In other words, if certain Asian-American students, such as those attending the 11 excluded majority-Asian-American middle schools, were treated unequally from non-Asian-American students at eligible middle schools and thus excluded from the Discovery Program because of a racially motivated policy, such intentional unequal treatment is not cured by the fact that, because of other (allegedly unintended) variables that led to a general jump in ENI, enough Asian-American students at other middle schools secured admission to yield an overall slight increase in Asian-American students across the SHSs in 2020.

The district court also erred in concluding that no discriminatory effect could be demonstrated by these excluded students, notwithstanding the policy's motivation, because "all disadvantaged students attending schools with an ENI of less than 0.6 are equally prohibited from participating in [the] Discovery [Program], regardless of their race." 627 F. Supp. 3d at 265. If the new policies for the Discovery Program were motivated by an animus against Asian Americans, then Asian-American students rendered ineligible for the Discovery Program under those racially motivated polices have suffered a discriminatory effect or harm in the form of diminished educational opportunity that is actionable under

the Equal Protection Clause, even if they were not the only students rendered ineligible at their middle schools.

Thus, we hold that the evidence of the exclusion of Asian-American students at numerous New York City middle schools based on the new ENI criteria is sufficient discriminatory effect to assert a viable equal protection claim under *Arlington Heights* that would require strict scrutiny review if it were proven, after discovery, that the implementation of the ENI was racially motivated to reduce the number of Asian Americans in the SHSs. We also disagree with the City's suggestion that a reduction of the Asian-American students at two of the eight SHSs, Stuyvesant and Bronx Science, that resulted from the changes to the Discovery Program could not independently satisfy the requisite discriminatory effect if a discriminatory intent were proven. Plaintiffs submitted an expert study regarding the Fall 2020 entering class at those two schools, which they contend shows a discriminatory effect on Asian-American students because: (1) Asian-American students received 66.9 percent of the invitations to attend Stuyvesant in Fall 2020, but would have received 67.6 percent of the invitations if the pre-implementation 2018 criteria for the Discovery Program were used; and (2) Asian-American students received 55.8 percent of the invitations to attend Bronx Science

in Fall 2020, but would have received 57.2 percent of the invitations if the 2018 criteria for the Discovery Program were used. *See* Joint App'x 180. Because the lack of discovery on intent requires that we presume, for the purpose of the summary judgment motion, that the new Discovery Program criteria were motivated by a discriminatory intent to reduce the number of Asian-American students at those schools, the question becomes whether an equal protection claim would lie based on the exclusion from admission of some Asian-American students for Discovery Program seats at those two schools under the new criteria. The answer to that question is yes. For reasons previously discussed, if it is proven that these facially neutral criteria were enacted with discriminatory animus towards Asian Americans, an equal protection claim would arise if such discrimination resulted in certain Asian-American students being deprived of placement in their preferred high school under the new criteria. That some Asian-American students were unaffected or that the number of Asian-American students increased as a whole at the SHSs does not strip Plaintiffs of the ability to obtain recourse under the Equal Protection Clause based on the harm suffered by those students who were deprived of the opportunity to attend Stuyvesant or Bronx Science. Here, Plaintiffs' expert asserted that there are "specific, identifiable

[Asian-American] students in the 2020 admissions cohort who would have been admitted to Stuyvesant High School and Bronx Science had the 2018 admissions [criteria] been used." Joint App'x at 358. If a racial motivation for the changes to the Discovery Program is shown and the expert's study is correct, the exclusion of those specific, identifiable Asian-American students is a sufficient discriminatory effect to trigger an equal protection claim under *Arlington Heights* and subject the Discovery Program to strict scrutiny.[10]

On remand, Plaintiffs may be able to show evidence of discriminatory intent once discovery on that issue is obtained. If such intent is established, a plaintiff need only demonstrate that they suffered some harm from the law or policy, not an aggregate disparate impact to the racial group they have proven was targeted. Thus, if such intent is shown here, Plaintiffs may sustain an equal protection claim

---

[10] To the extent the City suggests that this evidence should not be credited because of the methodology utilized by Plaintiffs' expert, we note that the district court did not exclude the expert's report and, on summary judgment, we must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Koral v. Saunders*, 36 F.4th 400, 408 (2d Cir. 2022) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)). In any event, as noted *supra*, the evidence of the exclusion of Asian-American students at certain middle schools from the Discovery Program under the new criteria is a sufficient discriminatory effect or harm to require discovery on the issue of discriminatory intent before the City can obtain summary judgment in its favor on the equal protection claim.

under *Arlington Heights* if any Asian-American students suffered a discriminatory effect either by their exclusion from seats reserved for the Discovery Program or the denial of admission to their preferred SHS under the new criteria. Therefore, it was premature for the district court to grant summary judgment on Plaintiffs' equal protection claim due to the lack of an aggregate disproportionate impact prior to discovery on the issue of the City's intent in revising the Discovery Program.[11]

## CONCLUSION

In sum, we hold:

1.  An aggregate disparate impact on the affected class is not the exclusive means by which a plaintiff can demonstrate the discriminatory effect that is required to prevail on an equal protection claim under *Arlington Heights*.

2.  With the assumption that Plaintiffs can prove after discovery that the policy changes to the Discovery Program were made with the

---

[11] Because we find that the district court erred in granting summary judgment before Plaintiffs were afforded discovery on the defendants' intent in reforming the Discovery Program, we need not decide whether those reforms would survive strict scrutiny review if such intent were ultimately proven.

discriminatory intent to reduce the number of Asian-American students at the SHSs, the district court erred in holding that Plaintiffs must show an aggregate disparate impact on Asian-American students to demonstrate the requisite discriminatory effect under *Arlington Heights*.

3. With the assumption that the policy changes to the Discovery Program were motivated by discriminatory intent, evidence that Asian-American students at certain middle schools across New York City were excluded from the Discovery Program under the new criteria, as well as evidence that other Asian-American students were denied admission to their preferred SHSs given the new criteria, is sufficient to demonstrate the requisite discriminatory effect under *Arlington Heights* and preclude summary judgment on that ground.

For the foregoing reasons, we **VACATE** the district court's grant of summary judgment, and the case is **REMANDED** to the district court for further proceedings consistent with this opinion.[12]

---

[12] Although we directed in the previous summary order, which found a lack of standing, that any subsequent appeal (if standing was cured) should be referred to this panel in the interest of judicial economy, *see Christa McAuliffe Intermediate Sch. PTO, Inc.*, 788 F. App'x at 86, any subsequent appeals at this juncture should be assigned to a new panel in the ordinary course.